Virgil CAROTHERS, Member and Representative of a Class of Certain Employees of the Western Transportation Company, Named Defendant, Plaintiff-Appellant,

v.

WESTERN TRANSPORTATION COMPANY, Defendant-Appellee.

No. 76–1662.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 19, 1976.

Decided April 27, 1977.

Rehearing and Rehearing En Banc Denied Aug. 30, 1977.

Dennis A. DePorter, Walter D. Braud, Rock Island, Ill., for plaintiff-appellant.

Charles R. Sprowl, E. Marvin Buehler, Chicago, Ill., Virgil Bozeman, Moline, Ill., for defendant-appellee.

Before CLARK,[*] Associate Justice, FAIRCHILD, Chief Judge, and PELL, Circuit Judge.

FAIRCHILD, Chief Judge.

Plaintiff Carothers appeals from the dismissal of an action brought on behalf of himself and a class of employees of defendant Western Transportation Company, in which plaintiff charged defendant with violating Interstate Commerce Commission Special Permission No. 74–2525 (set out in the Appendix) and wrongfully converting revenues collected thereunder. The district court ordered the action maintained as a class action, and plaintiff and members of the class will be referred to as "plaintiffs."

### I

Defendant Western Transportation Company is a motor vehicle carrier, authorized by the Interstate Commerce Commission ("I.C.C.") to transport commercial goods in interstate commerce. The plaintiffs are owner-operator employees of defendant; each owning truck-tractors which were leased to defendant and operated by plaintiffs in defendant's service between February 7, 1974 and August 26, 1974.

At all times pertinent hereto, a collective bargaining agreement between defendant and Local 710 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America (collective bargaining agent for plaintiffs) was in effect, governing the rights and obligations of the parties with respect to terms and conditions of employment. As contemplated in the union contract, each member of the class leased his equipment to Western. The leases provided that plaintiff lessors were to pay for fuel. Although the district court did not reach defendant's motion for summary judgment, it was claimed in supporting affidavits that the union contract was supplemented to provide that defendant was to compensate plaintiffs for increases in the cost of fuel.[1] Article 7 of the collective bargaining agreement spells out a grievance procedure for the resolution of disputes.[2] Defendant contends, and the district court agreed as one ground for dismissal, that plaintiffs could not maintain the action since they had failed to resort to the contractual grievance procedure.

---

[*] The Honorable Tom C. Clark, Associate Justice (Retired) of the Supreme Court of the United States, is sitting by designation.

1. Defendant asserts that on December 3, 1976, the defendant and the Union agreed to supplement their collective bargaining agreement whereby, effective November 1, 1973, defendant would bear the burden of price increases over the cost of fuel as of July 1, 1973. The agreement was further supplemented, defendant contends, to provide that, effective February 1, 1974, the basis of reimbursement would be changed to the May 15, 1973 cost of fuel. Plaintiffs, on the other hand, seem to claim that no supplement to the collective bargaining agreement was made.

2. ARTICLE 7—Grievance Machinery & Committees
   The Union and the Employer agree that there shall be no strike, lockout, tie-up or legal proceedings without first using all possible means of settlement, as provided for in this Agreement, of any controversy which might arise.

Disputes shall first be taken up between the Employer and the Local Union involved. Failing adjustment by these parties, the following procedure shall then apply:

The dispute or grievance arising out of operations under this Agreement shall then be referred to the Central States Drivers Council, in writing, and after such reference, shall be handled under the usual procedure by a representative of the Company and the Central States Drivers Council.

The Local Union, or Central States Drivers Council Committee shall have the right to examine time sheets and any other records pertaining to the computation of compensation of any individual or individuals whose pay is in dispute.

Deadlock cases may be submitted to an umpire for handling if the Union and the Company concur. Otherwise either party shall be permitted all legal or economic recourse.

On February 7, 1974, in response to marked increases in fuel costs affecting the trucking industry, the I.C.C. promulgated Special Permission No. 74–2525, denominated "Emergency Fuel Surcharge for Line-Haul Transportation Charges and Other Charges—Motor Common Carriers." Paragraph 1 of this order authorized all carriers who had tariffs or schedules on file with the Commission to increase by surcharge, up to 6 percent, fares and freight charges for services which consume fuel. Pursuant to this authorization, defendant instituted surcharges on certain of its services. Paragraph 4 of Special Permission No. 74–2525 stated that "The person actually responsible for the payment of fuel charges, by contract or otherwise, is to receive the full increase in revenue derived from surcharges published hereunder." Monies collected by virtue of defendant's surcharges were retained by defendant.

It is Special Permission No. 74–2525 and particularly paragraph 4 that form the parameters of this case. Plaintiffs alleged that they, rather than defendant, were "the person actually responsible for the payment of fuel charges" and thus were entitled to receive revenues derived from the surcharges imposed by defendant. Plaintiffs contended that the failure of defendant to "pass on" such monies was a violation of the I.C.C. order and constituted wrongful conversion. Defendant argued that the compensation it paid pursuant to the collective bargaining agreement supplements was equal to the increases in the cost of fuel and, as such, constituted full compliance with all pertinent provisions. Plaintiffs' complaint was filed in district court on June 20, 1975, more than one year after the date of the Commission's order.[3]

The district court dismissed the complaint. It held that Special Permission No. 74–2525 was an "order for the payment of money" within the meaning of 49 U.S.C. § 16(3)(f) and thus found plaintiffs' action barred by the one-year statute of limitations established therein. As an alternative ground for dismissal, the district court held that it lacked jurisdiction since the grievance procedures of the parties' collective bargaining agreement had not been first invoked. It reasoned that the matter in controversy related to conditions of plaintiffs' employment and was therefore a subject governed by that agreement.

For the reasons set forth below, we reverse.

## II

█ The initial issue which we must resolve is the applicability of 49 U.S.C. § 16(3)(f) to the maintenance of plaintiffs' action. Section 16(3)(f) states:

"A complaint for the enforcement of an order of the commission for the payment of money shall be filed in the district court . . . within one year from the date of the order, and not after."

---

3. Although the merits of the dispute are not before us at this stage, it seems helpful to bear in mind, generally, what the contentions are.

Defendant asserts that as early as November, 1973 it began to make an allowance to the owner-operators for the increase in cost of fuel over the cost as of July, 1973 and that it later began to make an allowance for the increase in cost over the cost as of May 15, 1973 so that it fully complied with the order of the I.C.C. in Ex Parte No. MC–43 (Sub. No. 2), effective February 15, 1974. Plaintiffs assert that they were not paid the full amount of such increases. It appears evident that the aggregate of the surcharges collected by defendant from shippers pursuant to the Special Permission exceeds the amounts paid by defendant to the owner-operators as an allowance for increased fuel costs; hence the law suit.

The I.C.C. order in Ex Parte No. MC–43 appears at 39 F.R. 6519 and required, effective February 15, 1974, an adjustment "to reflect rising fuel costs where the lessor is responsible for supplying the fuel." The base date for computing the increase is May 15, 1973.

It seems fair to summarize defendant's position as being that by paying the owner-lessors for the increase in cost of fuel, defendant qualified to receive and retain the surcharge, as being the "person actually responsible for the payment of fuel charges" within the meaning of the Special Permission.

Defendant also appears to claim that some shipments to which the surcharge was applicable, and for which the line-haul was performed by plaintiffs, included pickup and delivery performed by defendant, with fuel it provided.

Defendant argues that Special Permission No. 74–2525 is an order for the payment of money, that if plaintiffs' action be appropriate at all it would be a suit to enforce pursuant to § 16(2) "an order for the payment of money," and that this action is consequently barred by the provisions of section 16(3)(f) since it was not filed within one year from the date of such order.

The Commission's order, Special Permission No. 74–2525, was addressed to relief for the burden of increasing fuel costs. It authorized, prospectively, each carrier to impose, upon one day's notice, a percentage surcharge, not exceeding 6 percent. Although such surcharge was left to the option of the carrier, the stated purpose was to "recoup such average increased costs forthwith." The portion of the order under consideration provided that "The person actually responsible for the payment of fuel charges, by contract or otherwise, is to receive the full increase in revenue derived from surcharges published hereunder."

Any obligation by the carrier to pay an owner-operator under the order would arise only if the carrier elected to impose the surcharge and if, in fact, the owner-operator was actually responsible for the payment of fuel charges. An obligation would arise, even then, only as and in the amounts that surcharges were collected. The order, prospective in its impact, really amounts to a regulation. If "an order . . . for the payment of money" be analogized to a money judgment determining liability on the basis of already existing facts, and ordering that the liability be discharged by payment, the distinction between the Special Permission and an order for the payment of money is clear.

The Act contains no definition of an "order for the payment of money." It does appear, however, that the analogy of a money judgment (in contrast to a regulation) is sound.

49 U.S.C. § 13 provides for investigation of possible violations upon the filing of complaints and upon the Commission's own motion. Where the proceeding is initiated by a complaint, it can apparently result in an "order for the payment of money," because subsection (2), in granting the Commission on its own motion the same powers as upon a complaint, expressly includes the making and enforcing of orders "excepting orders for the payment of money."

49 U.S.C. § 16(1) provides as follows: "If, after hearing on a complaint made as provided in section 13 of this title, the commission shall determine that any party complainant is entitled to an award of damages under the provisions of this chapter for a violation thereof, the commission shall make an order directing the carrier to pay to the complainant the sum to which he is entitled on or before a day named."

The section apparently authorizes an "order for the payment of money" although it uses the phrasing "order directing the carrier to pay—the sum."

49 U.S.C. § 16(2) authorizes an action in district court to enforce an "order for the payment of money" and § 16(3)(f) prescribes a one year limitation for an action to enforce such order.

These provisions have been read together as relating to an "order for the payment of money." *Wisconsin Bridge & Iron Co. v. Illinois Terminal Co.*, 88 F.2d 459, 462 (7th Cir. 1937); *Missouri Pacific Railroad Company v. Austin*, 292 F.2d 415 (5th Cir. 1961).

In two cases this court treated an I.C.C. order as an "order for the payment of money" even though it did not arise directly out of a proceeding for violation initiated by complaint. *Aluminum Co. of Amer. v. Admiral Merchants M. Frgt., Inc.*, 486 F.2d 717 (7th Cir. 1973), *cert. denied*, 414 U.S. 1113, 94 S.Ct. 843, 38 L.Ed.2d 739 and *Container Corp. of Am. v. Admiral Merchants M. Frgt., Inc.*, 489 F.2d 825 (7th Cir. 1973). In the underlying Commission proceeding, the carriers had published rate increases. In response to protests filed by various shippers, however, the Commission instituted an investigation. A continuance of those hearings was granted, subject to the condition that in the event that any of the increased rates were ultimately disapproved by the

Commission, the carriers would then be required to make refunds to shippers of all such increases collected. The Commission later found that the increased rates had not been shown to be reasonable, ordered them cancelled, and required in its order that the respondent carriers refund to shippers the excess rates collected during the pendency of the tariff investigation. That order did not stem from a complaint filed under § 13 of Title 49; the Commission promulgated its refund decision under the provisions of § 316.[4] Moreover, the Commission's order contained no finding as to the amount of the refund, and fixed no time within which the refunds were to be made. Despite these omissions, this court in *Aluminum Co.* held that the refund order was enforceable as an order to pay money within section 16(2) and in the *Container Corp.* case found that the statute of limitations contained in § 16(3)(f) was applicable.

Although the order requiring refunds, and involved in these cases, did not neatly fit into the category of orders, (1) entered as a result of hearings on a complaint, (2) reflecting an award of damages, and (3) directing a carrier to pay a complainant the sum to which he has been found to be entitled, we do not consider these cases in conflict with our conclusion that Special Permission No. 74–2525 is not an "order for the payment of money" as used in § 16. The refund order involved in those cases determined a present liability to pay money upon the basis of existing facts and past events. Although the order did not specify the amounts to be paid, they were readily ascertainable. Special Permission No. 74–2525 was prospective only, and required payment of money only upon the occurrence of events which might or might not

occur in the future, including the imposition of a surcharge at the option of the carrier.

It seems highly illogical to conclude that Congress provided a one year period of limitation beginning the date of issuance of an order when any liability thereunder would arise only at some indefinite time in the future. A somewhat related problem was solved in *Missouri Pacific Railroad Company v. Austin, supra,* 292 F.2d at 419, by construing the "date of the order" as the day named in the order for payment. Paragraph 4 of the Special Permission, however, names no day for payment.

We note, moreover, that the jurisdiction for review of an order for the payment of money, or denial thereof, is distinct from that for review of other orders of the Commission. *United States v. ICC,* 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949), 28 U.S.C. § 1336(a).

In light of the above-described distinctions, we cannot conclude that Special Permission No. 74-2525 is an "order for the payment of money." Thus, an action to enforce it does not derive its authority from 49 U.S.C. § 16(2) nor is it subject to the limitation prescribed by § 16(3)(f).

### III

Having concluded that plaintiffs' action is not barred by the statute of limitations pertaining to orders for the payment of money, and, accordingly that the action is not authorized by § 16(2), it remains to be decided whether this suit can be maintained other than as an action to enforce such an order. Defendants contend that unless the present proceeding rests upon § 16(2),[5] plaintiffs have no cause of action. They argue that no remedies against motor carriers are provided in the Act except those of

---

4. 49 U.S.C. § 316(g). New rates; determination of fairness by Commission; suspension. Whenever there shall be filed with the Commission any schedule stating a new individual or joint rate . . . for the transportation of passengers or property by a common carrier or carriers by motor vehicle, . . . the Commission is authorized and empowered upon complaint of any interested party or upon its own initiative . . . to enter upon a hear-

ing concerning the lawfulness of such rate, . . . and after hearing, . . . the Commission may make such order with reference thereto as would be proper in a proceeding instituted after it had become effective. . . .

5. 49 U.S.C. § 16(2). Proceedings in courts to enforce orders [for the payment of money], *supra,* note 4.

§ 16(2) and the action for reparations and overcharges recognized by § 304a;[6] since the present action does not fall within the coverage of the latter, no right to judicial relief remains available to plaintiffs. Plaintiffs, however, characterize this proceeding as an action for damages for violation of an order of the Commission, and claim a right to relief under §§ 8[7] and 9[8] of the Interstate Commerce Act, 49 U.S.C. §§ 8 and 9[9].

We do not reach the issue of whether plaintiffs' suit may be brought under the proffered sections, as we view the theory of this case quite differently. We hold that plaintiffs may maintain this action, but for reasons argued by neither party. The operative facts herein stem from the issuance of Special Permission No. 74–2525 requiring that the person "actually responsible for the payment of fuel charges" receive the revenues derived from surcharges imposed pursuant thereto. Both parties contend that, under this directive, they should receive the disputed revenues.

Plaintiffs' action is, in substance, one to enforce compliance with the portion of Special Permission No. 74–2525 imposing a liability with respect to proceeds of a surcharge authorized by the Special Permission. Section 16(12) of Part I of the Act authorizes proceedings in court to enforce orders other than for payment of money, as follows:

"If any carrier fails or neglects to obey any order of the commission other than for the payment of money, while the same is in effect, . . . any party injured thereby, . . . may apply to any district court of the United States of competent jurisdiction for the enforcement of such order, . . ."

Although Paragraph 4 of Special Permission No. 74–2525 does cause a liability for payment of money to arise upon the occurrence of certain circumstances, and thus could semantically fall within the description "order for the payment of money," we have concluded that for the purpose of these statutes, such phrase is a term of art which does not include the Special Permission. We think, as a result, that an action to enforce it is authorized under § 16(12).

The only question that remains, then, is the applicability of § 16(12) to actions, such as that at bar, against carriers by motor vehicle.

The Interstate Commerce Act originally applied only to railroads and certain other

6. 49 U.S.C. § 304a, Interstate Commerce Act, Part II, § 204a. § 304a(2) states in part:
"For recovery of reparations, action at law shall be begun against common carriers by motor vehicle subject to this chapter within two years . . . and for recovery of overcharges, action at law shall be begun . . within three years from the time the cause of action accrues, . . ."
§ 304a(5) defines the term "reparations" as used in that section as:
". . . damages resulting from charges for transportation services to the extent that the Commission, . . . finds them to have been unjust and unreasonable, . . ."

7. 49 U.S.C. § 8 states in pertinent part:
"Liability in damages to persons injured by violation of law. In case any common carrier subject to the provisions of this chapter shall do, . . . any act, matter or thing in this chapter prohibited . . . or shall omit to do any act . . . required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, . . ."

8. 49 U.S.C. § 9. Remedies of persons damaged; election; witnesses. Any person or persons claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit in his or their own behalf for the recovery of damages for which such common carrier may be liable under the provisions of this chapter in any district court of the United States of competent jurisdiction; . . .

9. 49 U.S.C. § 304(c), part of the Motor Carrier Act, would have permitted plaintiff to file a complaint for Western's alleged failure to comply with the Special Permission, and an order compelling compliance would have resulted. Very possibly such an order would be deemed an order for the payment of money so that suit would be authorized by § 16(2), but in any event, § 305(h) makes § 17 applicable to the Motor Carrier Act, and § 17(9) authorizes a suit to enforce an order.

carriers, but did not establish a scheme of regulation for motor carriers. These provisions are now designated as Part I (49 U.S.C. § 1 *et seq.*) of the Act. Part II, Chapter 8 of 49 U.S.C., was added in 1935 regulating carriers by motor vehicle.

Part I of the Act contains several sections providing for both judicial and administrative remedies for persons damaged by failure of railroad carriers to comply with the Act. Section 8 thereof relates to carriers' liability in damages to persons injured by violations of the Act and § 9 of Part I gives the injured party the right to make complaint to the I.C.C. or to sue in the federal district court. Section 13 establishes the right to proceed by complaint before the Commission upon a claim of violation of law by a carrier. In addition, provisions for the enforcement of orders by the Commission are contained in § 16 of Part I.

Part II is different in structure. 49 U.S.C. § 304(c) authorizes complaint proceedings before the Commission on claims of non-compliance; § 305(h) makes § 17 (of Part I) applicable to all proceedings under Part II of the Motor Carrier Act; § 17(9) authorizes court action to enforce orders in such proceedings. Part II does not appear to authorize, expressly, other court actions. Section 304(a), by prescribing limitations on court actions to recover charges, reparations, and overcharges, recognizes that such actions may be brought.

49 U.S.C. § 305(g),[10] provides:

"Any final order made under this chapter [Part II] shall be subject to the same right of relief in court by any party in interest as is now provided in respect to orders of the Commission made under chapter I of this title . . . ."

Section 305(g) has been read to mean that persons claiming injury by motor carriers shall have the same right to relief with respect to orders of the Commission as do persons claiming injury by rail carriers. The phrase "right to relief" has been held to encompass the right to bring an action.

*Western Elec. Co., Inc. v. Burlington Truck Lines, Inc.*, 501 F.2d 928, 934 (8th Cir. 1974). In *Aluminum Co. of Amer. v. Admiral Merchants M. Frgt., Inc.*, 486 F.2d 717 (7th Cir. 1973) we recognized that § 305(g) (205(g) of Part II of the Interstate Commerce Commission Act), incorporated by reference authorization of court actions provided in Part I of the Act with respect to an order of the Commission. Specifically, we found that through the operation of § 305(g), § 16(2) of Part I provided shippers by motor carrier with a statutory remedy for enforcement of a Commission order for the payment of money.

Similarly, since we are dealing with an order of the Commission issued under Part II of the Act, we again find in Part I of the Act authority for a private party to bring court action to enforce. Section 16(12) gives persons injured by reason of the failure of a carrier to obey any order of the Commission other than an order for the payment of money the right to bring an action in district court for enforcement of that order. Although this provision was originally designed to cover carriers by rail, we conclude, following *Admiral Merchants*, that § 305(g) incorporates § 16(12) of Part I. It is our conclusion that, taken as a whole, plaintiffs' pleadings state a claim upon which relief can be granted as described in 49 U.S.C. § 16(12), and that, through the operation of 49 U.S.C. § 305(g), plaintiffs' action for enforcement can be maintained thereunder.

28 U.S.C. § 1336(a), relied on by plaintiffs, grants jurisdiction to district courts to enforce any order of the I.C.C.

IV

The district court concluded that even if the complaint was grounded upon a theory other than that of enforcing an order for the payment of money, it would stand in no better stead, for it would be barred by plaintiffs' failure to utilize the

---

**10.** Section 205(g) of Part II of the Interstate Commerce Act. 49 U.S.C. § 305(g) as amended September 6, 1965, Pub.L. 89–170, § 1, 79 Stat. 648, January 2, 1975, Pub.L. 93–584, § 9, 88 Stat. 1918.

grievance machinery under the parties' collective bargaining agreement. This conclusion would appear to be correct if plaintiffs' claims were grounded upon a breach of the agreement. *Republic Steel v. Maddox*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965), *Vaca v. Sipes*, 386 U.S. 171, 184, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

The collective bargaining agreement provided a grievance procedure which could, but would not always, lead to a binding decision. Where the representatives of the union and the employer deadlock, there need not be arbitration unless the parties consent. The Agreement, however, did provide "that there shall be no strike, lockout, tie-up or legal proceedings without first using all possible means of settlement, as provided for in this agreement, of any controversy which might arise." The description "any controversy which might arise" is the ultimate in breadth. A later reference to a "dispute or grievance arising out of operations under this Agreement" is also very broad. At least in a § 301 context, "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Steelworkers v. Warrior & Gulf Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960).

The instant controversy would not have arisen but for the existence of the employer-employee and lessee-lessor relationship and the operations under the Agreement. The terms of the Agreement and leases are relevant to the claim made, but only insofar as they bear upon whether plaintiffs or defendant are the persons "actually responsible for the payment of fuel charges, by contract or otherwise."

The complaint, however, did not suggest any claim under the collective bargaining agreement nor the leases. It did not rely on § 301, 29 U.S.C. § 185. Plaintiffs' claim to the proceeds of the surcharge was based squarely on the terms of the Special Permission, and jurisdiction was alleged under 28 U.S.C. § 1336(a) (enforcement of an I.C.C. order), although § 1331 (federal question) and § 1332 (diversity) were also included.

Although the term "any controversy which might arise" could literally embrace a dispute over Western's compliance with paragraph 4 of the Special Permission, we do not see that the policy requiring exhaustion of the contractual grievance procedure applies to this dispute.

In *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), the Supreme Court addressed a situation where a collective bargaining agreement contained a nondiscrimination clause and an employee's claim of racial discrimination was submitted to arbitration and decided unfavorably. The Court held that the unfavorable arbitral decision on the employee's contract right did not bar him from pursuing his statutory cause of action under Title VII. Although the cases are not parallel, the Court's discussion of the difference between pursuit of a contract right and a statutory right is instructive.

The leases between the parties required that the plaintiff-lessors pay for all fuel. Such leases are subject to regulation by the I.C.C. in the public interest, as are the rates charged to shippers by the carriers. Special Permission No. 74–2525 was an emergency measure addressed to the problem of rising costs of fuel. It affected both rates and the leasing arrangements. The present dispute centers on the proper interpretation of this regulation, adopted in the public interest, and whether Western has complied with it. Plaintiffs' action is not based upon any contract right. Because a public regulation is involved, and one which was doubtless unforeseen by the parties who negotiated the collective bargaining agreement, we do not construe the contractual provision requiring exhaustion of the grievance procedure as applicable to an action to enforce the I.C.C. order.

The judgment appealed from is reversed and the cause remanded for further proceedings.

## APPENDIX

Special Permission No. 74–2525 *as amended* on February 12, 1974, 39 *Fed. Reg.* 5548:

SPECIAL PERMISSION NO. 74–2525 EMERGENCY FUEL SURCHARGE FOR LINE–HAUL TRANSPORTATION CHARGES & OTHER CHARGES—MOTOR COMMON CARRIERS

It appearing, That, in view of the critical fuel situation prevailing throughout the Nation, and its effect upon modes of transportation subject to this Commission's jurisdiction, immediate relief is warranted to permit *motor common carriers* to expeditiously recover increased fuel costs;

*It further appearing,* That, this Commission entered Special Permission Order No. *74–1825,* as amended, for the purpose of authorizing a means of passing on to the consumer on a dollar-for-dollar basis increases in fuel costs, *upon not less than 10 working days' notice;*

*And it further appearing,* That, the average increase in fuel expenses, including taxes, throughout the Nation since May 15, 1973, has increased such carriers costs by amounts requiring an approximate increase of 6 percent in operating revenues; and that, therefore, there is an urgent need for immediate relief in order that such carriers may recoup such average increased costs forthwith; and good cause appearing therefor:

*It is ordered,* That:

1. All such carriers or their authorized publishing agents that have tariffs or schedules on file with this Commission, or those carriers or agents that may in the future file tariffs or schedules with this Commission, are hereby authorized to depart from the terms of the governing tariff circulars to file and post on *not less than one day's notice* to this Commission and the public, an increase in passenger fares and freight charges for line-haul transportation and charges for other *services which consume fuel,* such as pickup and delivery, which must be specified in the tariffs, by means of a percentage surcharge, not to exceed 6 percent, except as otherwise authorized by this Commission. The surcharge provisions must include a rule for disposition of fractions of one cent or other stated amounts, or refer to a conversion table of increased charges or fares.

2. The Commission shall analyze the impact of fuel expenses on a month-to-month basis to determine whether there is justification for increasing or reducing the surcharge authorized by this order; if conditions warrant, this order will be amended accordingly.

3. The surcharge filed and posted under the authority of this permission may take the form of master tariff of increase, or as a supplement to the affected tariffs. If the master tariff form of publication is to be employed, reference thereto will be made by connecting link supplement to each tariff with the master. Such supplements may be blanket supplements (a common supplement issued to two or more tariffs), provided each copy officially filed is hand marked in the appropriate places as to the supplement number and the I.C.C. number of the tariff it supplements.

4. The person actually responsible for the payment of fuel charges, by contract or otherwise, is to receive the full increase in revenue derived from surcharges published hereunder. Each publication containing the surcharge shall contain whichever of the following certifications is appropriate:

This is to certify that each carrier party to this publication has been notified that: Special Permission No. 74–2525 requires that the person actually responsible, by contract or otherwise, for the payment of fuel charges is to receive the full increase in revenue derived from surcharges published thereunder, and that a carrier's participation in a publication filed thereunder constitutes an undertaking to comply with that requirement.

This is to certify that the person actually responsible, by contract or otherwise, for the payment of fuel charges will receive the full increase in freight revenue to be derived from the proposed surcharge.

5. This permission will remain in effect until further order of the Commission.

6. Publications issued and filed hereunder shall be exempt from the supplemental and volume limitations of the tariff circulars, shall contain no other matter and shall bear the following notation:

"Issued on one day's notice; I.C.C. permission No. 74–2525"

7. That the authority granted by Special Permission No. 74–1825, as amended, be, and it is hereby, rescinded, to the extent it applied to motor common carriers, except to the extent that supplements filed thereunder and which provide increases of 6 percent or more, the rule relief granted therein shall remain in effect until March 16, 1974; on or before that date any motor common carrier maintaining such a surcharge must obtain separate special permission authority from this Commission to continue the effectiveness of such surcharge.

8. Any surcharge of less than 6 percent filed under authority of Special Permission No. 74–1825, as amended, regardless of whether presently in effect, or filed but not yet effective, may be retained and incorporated, but such new surcharge including that retained may not exceed 6 percent.

9. Any surcharge which exceeds 6 percent may not be filed until separate special permission authority from this Commission is obtained; if such special permission application requests authority to file a surcharge on less than lawful notice, appropriate data, properly explained and supported, must accompany the application.

10. Only one surcharge as to a tariff may be in effect at one time, and any surcharge filed under authority of this permission shall not provide for any exceptions (non-application) with respect to any particular tariff.

11. All outstanding orders of the Commission are hereby modified to the extent necessary to permit the filing of the tariffs authorized herein. Increases filed hereunder shall not be deemed general increases or general adjustments as defined in section 1104.1(a) of Chapter X of Title 49 of the Code of Federal Regulations.

12. The requirement of following rate bureau procedures provided in agreements approved by this Commission under § 50 of the Interstate Commerce Act is waived to the extent necessary to permit the filing of the tariffs authorized herein.

13. Notice of this permission shall be given to the general public by mailing a copy of this order to the Governor of each State and to the Public Utilities Commissions or Boards of each State having jurisdiction over transportation, by depositing a copy in the Office of the Secretary, Interstate Commerce Commission, Washington, D. C., for public inspection, and by delivering a copy to the Director, Division of the Federal Register, for publication therein.