ESCANABA & LAKE SUPERIOR RAILROAD CO. *v.* UNITED STATES ET AL.

No. 415.  Argued February 4, 7, 1938.—Decided February 28, 1938.

*Mr. John S. Burchmore,* with whom *Mr. Clark M. Robertson* was on the brief, for appellant.

*Mr. J. Stanley Payne,* with whom *Acting Solicitor General Bell, Assistant Attorney General Jackson,* and *Messrs. Elmer B. Collins* and *Daniel W. Knowlton* were on the brief, for the United States and the Interstate Commerce Commission.

*Mr. C. R. Sutherland,* with whom *Mr. O. W. Dynes* was on the brief, for Scandrett et al., intervening defendants.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

This is an appeal from the judgment of a specially constituted District Court [1] dismissing the appellant's bill which prayed relief against an order of the Interstate Commerce Commission approving and authorizing a proposed pooling agreement between two other railroads.[2]

---

[1] 21 F. Supp. 151.

[2] 210 I. C. C. 599; 219 I. C. C. 285.

The single question presented is whether the appellant is a "carrier involved" within the meaning of § 5 (1) of the Interstate Commerce Act.[3]

The appellant, hereinafter sometimes called "Escanaba," is a Michigan corporation operating a railroad which does business in intrastate and interstate commerce. Its line extends from Escanaba, Michigan, a port on Lake Michigan, northwesterly some sixty-three miles to Channing, which is on the northern border of the Menominee ore district. This district was reached in 1900, and still is served, by the lines of the Chicago and Northwestern Railroad Company (herein denominated "Northwestern") extending from the mines in a general southeasterly direction to the Northwestern's ore docks at Escanaba. The Chicago, Milwaukee, St. Paul and Pacific Railroad Company (herein called "Milwaukee") had in and prior to 1900 a line reaching the Menominee district but the ore shipped over this line went south to a connection with the Soo Line and thence eastward to a destination other than Escanaba. Milwaukee and Escanaba entered into an agreement in 1900 whereby the former was to have trackage rights for its trains of iron ore from Channing to Escanaba, where the Milwaukee constructed its own ore docks for the lading of ore into lake steamers, and trackage rights for the return of its empty cars from Escanaba to Channing. On the footing of this contract Escanaba made a large investment in roadway suitable for the accommodation of Milwaukee's trains.

The details of the agreement are unimportant. It will suffice to say that Milwaukee had no right to carry passengers or freight, including ore, to intermediate points on the line of Escanaba; had no schedules for its ore

[3] Act of Feb. 4, 1887, c. 104, 24 Stat. 380, as amended by Transportation Act of Feb. 28, 1920, c. 91, § 407, 41 Stat. 480, U. S. C. Tit. 49, § 5 (1).

trains; operated them by its own personnel and power, subject, however, to the control of the line by Escanaba's dispatchers and signal men. Milwaukee was to pay for the privilege a certain wheelage charge which, in no event, was to be less than $27,000 a year whether the total wheelage amounted to that sum or not; and was to pay certain other amounts towards the maintenance of Escanaba's line. A renewal of this agreement is now in force and will so remain until January 1, 1951.

Milwaukee's docks at Escanaba have fallen into disrepair. To avoid the large expenditure required to restore them, and to retain a share of the ore transportation, Milwaukee negotiated a pooling agreement with Northwestern under the terms of which ore consigned over either line from the mines to Escanaba will be routed over Northwestern's line and use Northwestern's docks at Escanaba and the ore business of both lines will be pooled on an agreed basis. Inasmuch as certain freight other than iron ore has been interchanged by Milwaukee with Escanaba at Channing and by Northwestern with Escanaba at Escanaba, and, as it is believed the ore pooling arrangement and discontinuance of Milwaukee's ore haulage over Escanaba's tracks may cause Escanaba to abandon the western end of its line, thus preventing the interchange of Milwaukee and Escanaba at Channing, it is further agreed that Milwaukee and Northwestern shall pool the receipts from interchange traffic exchanged by either of them with Escanaba, to recompense Milwaukee for possible loss of business resulting from the ore traffic pool. The two railroads, parties to the pooling agreement, submitted it to the Interstate Commerce Commission for approval.[4] That body held that the proposed discontinuance of operation by Milwaukee over Escanaba's line under the trackage agreement

---

[4] They were represented before the Commission by their respective trustees appointed under § 77 of the Bankruptcy Act.

amounted to an abandonment as defined by § 1 (18) of the Interstate Commerce Act [5] and, without the Commission's approval of the abandonment, the pooling agreement could not become effective. The Commission, therefore, refused to pass upon it. Thereupon the parties resubmitted the pooling agreement together with a conditional application by Milwaukee for abandonment of its ore haulage over Escanaba. Escanaba intervened in the proceeding, and resisted the issue of an order of approval. A hearing was had at which not only Escanaba but many shippers and communities on its line presented evidence. The Commission made the findings required by §§ 1 (18) and 5 (1) of the Act, particularly that the proposed pooling arrangement and abandonment of the line by Milwaukee would promote the public interest and convenience and issued orders authorizing the proposed arrangement. Escanaba has abandoned the contention made in the District Court, and there overruled, that the Commission's findings are not supported by any evidence, and here attacks only the alleged error of law of the Commission and the court below in holding that it is not a "party involved" in the pooling agreement within the meaning of § 5 (1), whose assent is necessary to the approval of the Commisison.

Section 5 (1) of the original Interstate Commerce Act in sweeping terms forbade all pooling of freights of different and competing railroads and all agreements for division of aggregate or net proceeds of their earnings or any portion thereof. The Transportation Act, 1920, qualified this prohibition by excepting such arrangements as should have the specific approval of the Commission, and that approval was thus conditioned:

"That whenever the Commission is of opinion, after hearing upon application of any carrier or carriers engaged in the transportation of passengers or property sub-

[5] U. S. C. Tit. 49, § 1 (18).

ject to this Act, or upon its own initiative, that the division of their traffic or earnings, to the extent indicated by the Commission, will be in the interest of better service to the public, or economy in operation, and will not unduly restrain competition, the Commission shall have authority by order to approve and authorize, *if assented to by all the carriers involved,* such division of traffic or earnings, under such rules and regulations, and for such consideration as between such carriers and upon such terms and conditions, as shall be found by the Commission to be just and reasonable in the premises." (Italics supplied.)

The controversy revolves around the meaning of the phrase "if assented to by all the carriers involved." Escanaba insists that it is a carrier involved in the proposed agreement, and its assent is necessary to an affirmative order of the Commission. The appellees deny that it is such and the Commission and the District Court have held with them. We are of opinion that the decree of the District Court was right and must be affirmed.

*First.* The amendment of § 5 (1) of the original statute by the Transportation Act, 1920, was one of the alterations made in the Act as a result of experience gained from unified operation of the railroads under federal control. The strict sanctions of the original Act, intended to preserve competition between carriers, were, in a number of instances, relaxed. Mergers and consolidations were authorized, pooling arrangements were to be permitted, extensions and abandonments were made lawful and divisions of joint through rates might be adjusted, all for the sake of economy and efficiency and the prevention of destructive competitive practices, and all subject to the supervision and control of the Interstate Commerce Commission, and its finding that the action proposed or ordered would be in the public interest. These amendments are to be given liberal construction in aid of the purposes Congress had in mind. Under the new provi-

sions, Milwaukee and Northwestern might have merged or consolidated if the Commission found such a procedure would be in the public interest. Similar considerations would justify their proposed pooling of freight transportation. Shippers over Escanaba's lines, communities served by it, and, indeed, shippers in communities on distant lines and persons having no other interest than that of the general public welfare, were entitled to be heard before the Commission and to present whatever proofs might tend to show that the proposed agreement would or would not be for the public welfare. They, however, are not "carriers involved," mentioned in § 5 (1). Escanaba had the undoubted right accorded it to appear and to be heard on the question of the public interest and welfare and indeed so had every carrier having connections with Milwaukee and Northwestern. The question involved in the appellant's contention is whether it or any other carrier, not actually a party to the pooling agreement, is a "carrier involved" within the meaning of the Act, so that it may frustrate the agreement by withholding its assent.

*Second.* Escanaba is not a carrier of the ore which is hauled between Channing and Escanaba under the trackage agreement. It receives no part of the freight paid, it issues no bills of lading, it maintains no tariffs covering that transportation. It neither holds itself out to serve in that respect nor renders any service to shippers of ore; and, as respects the proposed pooling of freights on Milwaukee's traffic, exchanged with it at Channing, and Northwestern's traffic, exchanged with it at Escanaba, is not a carrier involved in the service rendered up to the exchange points, which is to be pooled. But it is said that the word "involved" connotes something more than a party to an agreement; that it embraces any railroad affected by the arrangement. And, it is urged, Escanaba will be seriously injured by the proposed arrangement, in

spite of the continuing obligation of Milwaukee to pay it a minimum of $27,000 per annum until 1951.

If a carrier not a party, but adversely affected, is "involved" in the sense of § 5 (1) Escanaba's assent is a condition precedent to authorization by the Commission. We must then determine the meaning of the phrase as used in the statute. Aid is afforded by the context. The section gives the Commission authority to approve and authorize, "if assented to by all the carriers involved, . . . under such rules and regulations, and for such consideration *as between such carriers* and upon such terms and conditions," as the Commission shall find just and reasonable. This reference to the mutual considerations to be exchanged by "such carriers" shows that Congress meant by the phrase "all the carriers involved," those, and those only, who are parties to the pooling of freights and the division of the proceeds. Escanaba, however, insists that if the section is to be construed to require the assent of none but the parties to the pooling agreement it is mere surplusage. It points out that Milwaukee and Northwestern have assented and are now merely asking the approval and authorization of the Commission. The argument, however, overlooks the fact that the Commission may authorize pooling on the application of a single carrier or upon its own initiative. In the first case the assent of one or more other carriers, and in the second the assent of all the carriers is a prerequisite to its action. It appears, therefore, that though confined to the parties to the pool, the requirement that all carriers involved shall assent has a proper office in the statutory scheme.

*Third.* In view of Escanaba's relation to the traffic involved in the proposed pool, the decision that its assent is a prerequisite to the plan's operation would involve the gravest inconvenience and perhaps render the provision of § 5 (1) nugatory. It is difficult to conceive of any pooling arrangement between two carriers which will not affect, in a greater or less degree, other carriers who inter-

change traffic with one or the other of the pooling roads, or with their connections. If the private interest of any such outside carrier should move it to refuse its assent to the arrangement it could, in the view urged by the appellant, veto the proposal although, on the whole and in the long view, the consummation of the plan might greatly enhance the economies of operation of large and important carriers and so promote the public interest. We cannot believe that every carrier, in such sense affected by a proposed pool to which it is not a party, was intended to have a status different from, and perhaps at war with, the interest of the general public in the efficient and economical operation of the railroads envisaged by the Transportation Act.

We conclude that not only the words of the statute but the obvious policy and intent underlying its provisions require an affirmance of the judgment of the District Court.

*Affirmed.*

MR. JUSTICE CARDOZO took no part in the consideration or decision of this case.