RAILWAY LABOR EXECUTIVES' AS-SOCIATION, The Brotherhood of Railway and Steamship Clerks, et al., Plaintiffs,

v.

UNITED STATES of America, Interstate Commerce Commission and Seaboard Air Line Railroad Company, Defendants.

Civ. A. No. 3412.

United States District Court
E. D. Virginia
at Alexandria.

Argued Jan. 28, 1963.

Decided March 21, 1963.

James L. Highsaw, Jr., Washington, D. C. (William H. King, Richmond, Va., on the brief), for plaintiffs.

Leonard S. Goodman, Washington, D. C. (Robert W. Ginnane, General Counsel, on the brief), for defendant, Interstate Commerce Commission.

Richard A. Hollander, Richmond, Va., for defendant, Seaboard Air Line Railroad Company.

Lee Loevinger, Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., C. V. Spratley, Jr., U. S. Atty., Richmond, Va., MacDougal Rice, Asst. U. S. Atty., Alexandria, Va., for defendant, United States of America.

Before BRYAN, Circuit Judge, and JOHN PAUL and LEWIS, District Judges.

ALBERT V. BRYAN, Circuit Judge.

As "railroad employees affected", certain C. & O. Railway personnel and their Unions[1] now charge that their employment was not protected, as required by the Interstate Commerce Act[2], in a Commission order granting the Seaboard Air Line Railroad authority[3] to acquire joint control and use of Broad Street

---

1. Railway Labor Executives' Association; Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees.

2. § 5(2) (f), 49 U.S.C. § 5(2) (f).

3. § 5(2), 49 U.S.C. § 5(2).

station in the city of Richmond, Virginia.[4]

In this acquisition Seaboard Air Line Railroad Company abandoned use of the Main Street station which it had built and occupied since 1901 in conjunction with the Chesapeake & Ohio Railway Company. Employees of Chesapeake operated the station at Main for both railroads under an arrangement between them for apportionment and reimbursement of the cost. The withdrawal of Seaboard decreased the number of employees needed there and the persons now suing were furloughed by reason of this reduction.

The Commission quite candidly conceded the plaintiff employees were in fact affected. But as they were not employees engaged by Seaboard and as Chesapeake was not an actual or required party, and so not "involved", in the Seaboard authorization proceeding, the Commission concluded they were not "employees affected" within the meaning of § 5(2) (f) of the Act upon which the plaintiffs rely. This section reads:

"(f) As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order. Notwithstanding any other provisions of this chapter and chapters 8 and 12 of this title, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees."

█ Viewed in its primary purpose, we think the Act covers the individual plaintiffs, and for these reasons:

1. Section 5(2) (f) commands protection of "employees affected" by the "transaction". The "transaction" here is the acquisition by Seaboard of the use of Broad Street station. The Act does not, as the Commission would say, limit its security to employees of a carrier involved in the transaction. The guardianship is not dependent upon the role of their employer in the transaction. All "employees affected" are under the aegis of the Act. The only question is whether they are "affected": Are they touched sufficiently by the transaction? As our recount of the facts will prove, that inquiry is fully satisfied presently by the immediacy of the relation to Seaboard of the complaining Chesapeake employees.

2. Again, the Chesapeake employees here should also prevail even if the position of the Commission is correct: that the Act only secures employees of a carrier involved in the transaction. In our judgment the acquisition by Seaboard of rights in Broad Street station was, in the phrase of § 5(2) (f) a "transaction involving" Chesapeake. As the outline of the facts will reveal, although not a party to the proceeding before the Commission, Chesapeake was in actuality deeply and unavoidably involved. The Act is concerned with the personal

4. 307 I.C.C. 805, Finance Docket 20423, March 17, 1959, and 312 I.C.C. 507, April 18, 1961 and October 26, 1961.

welfare of the employees and deals with the realities of the transaction.

This suit does not require our ascertainment of whether the plaintiff employees have been *adversely* affected and the extent of the reparations, if any, due them. Those are determinations to be made by the Commission if we decide, as we have, that in the circumstances the plaintiffs are in law "employees affected".

Broad Street station is in the west of Richmond, the Main Street station several miles away in the eastern part of the city. Before its acquisition of an interest in Broad Seaboard did not enter that station with passenger traffic, but confined itself to Main. Seaboard moved to Broad in April 1959. From the very beginning, by mutual agreement, the whole operation of Main, including maintenance and provision of materials and supplies, was the primary responsibility of Chesapeake, which billed Seaboard for its share of the expense. Personnel at Main were hired and were dischargeable, and their compensation, duties and seniority prescribed, solely by Chesapeake. No railroad labor bargaining agreements governed there save Chesapeake's. The time of the employees at Main since 1936 was divided between the two railroads approximately in the proportions of 66% for Seaboard and 34% for Chesapeake. But each day all personnel were occupied without interruption in serving one or both of the companies, depending upon the demands at the moment.

Seaboard's entry into Broad was provided for in an agreement dated November 21, 1958 with the roads then controlling and using the station. Seaboard's settlement with Chesapeake upon its severance from Main was set forth in an agreement between the two under date of December 31, 1958.

I. This recital of the facts plainly confirms the Commission's finding that the plaintiff Chesapeake employees at Main were actually affected by the Seaboard transaction. It shows, too, that practically they worked for Seaboard as well as for Chesapeake. Indeed, they were in reality, though not in contract, as much the employees of Seaboard as of Chesapeake. Their engagement and control by Chesapeake alone were arrangements merely for the railroads' convenience; it did not alter the truth that they were Seaboard's personnel as well.

With so immediate a relationship between them and Seaboard, and with the concession that Seaboard's transaction did cause them loss of employment, it is hypertechnical to say the individuals suing here were not "employees affected" within the first provision of § 5(2) (f) supra. In these circumstances the plaintiffs' right to protection from the statute is undeniable. No other prerequisite to the enjoyment of the security of the Act is exacted. The remainder of the section need not be considered for it in no way detracts from the bestowal of the first sentence. Railway Labor Executives' Ass'n v. United States, 339 U.S. 142, 153, 70 S.Ct. 530, 94 L.Ed. 721 (1950).

II. But, to repeat, if we accept the Commission's interpretation—that to be "affected" the employees must be those of a party to the transaction—the employees here would still be under the Act, because Seaboard's acquisition was a "transaction involving" Chesapeake.

Apart from any implications to be drawn from the fact that Seaboard's agreement with the other owners of Broad reserved to Seaboard the right to be released from that agreement in the event it could not be discharged of its obligations to Chesapeake at Main, and without reference to the agreement of Seaboard and Chesapeake for the removal from Main, we think the interrelation of Seaboard and Chesapeake at Main discloses that Chesapeake became involved when Seaboard sought to leave there. Obviously, Seaboard was procuring facilities in place of those at Main. Chesapeake at once had to close the gap there.

Escanaba & L. S. R. R. v. United States, 303 U.S. 315, 58 S.Ct. 556, 82 L.

Ed. 867 (1938) does not oppose our interpretation. The Escanaba was declared not to be a "carrier involved" in a pooling agreement of two other railroads under § 5(1) of the Act. Escanaba merely interchanged freight at common termini with the other carriers. There was no common or joint ownership and operation of a facility with either of the other roads, such as Seaboard and Chesapeake had in the Main Street station.

III. Our interpretation, we are told, is unworkable for this: if persons not employed by a party to the transaction are adjudged to be "employees affected", serious difficulty would be encountered in making provision for them, because their employer would not be before the Commission. The answer is that the obligation could be taken care of by requiring the applicant carrier to see to the protection directly or through agreement with the employer-carrier and the employees, as permitted by the last sentence of § 5(2) (f). At all events it is not such an obstacle as should be permitted to deprive the employees of the Act's solicitude.

Our construction is also said to be contrary to the legislative history of the Act, especially to the Washington Job Protection Agreement of May 31, 1936. The terms and stipulations of the Agreement have been fully discussed and explained in Brotherhood of Maintenance of Way Employees v. United States, 366 U.S. 169, 173, 81 S.Ct. 913, 6 L.Ed.2d 206 (1961); Railway Labor Executives' Ass'n v. United States, supra, 339 U.S. 142, 147, 70 S.Ct. 530, 94 L.Ed. 721; and in United States v. Lowden, 308 U.S. 225, 60 S.Ct. 248, 84 L.Ed. 208 (1939). While it is true that the Agreement was the Act's forerunner in saving employees harmless in railroad consolidations or mergers, we have no occasion to analyze the Agreement or to descant upon the legislative history of the Act, for § 5(2) (f) is quite free of ambiguity. In passing, however, it is noteworthy that the parties here have stipulated that in the event of remand the rights of the plaintiffs would be adjusted under the conditions, with immaterial variations, contained in the Agreement.

Certain decisions of the Commission—including Baltimore & Ohio R. Co. Operation, 261 I.C.C. 615 and Spartanburg Term. Co. Construction, 295 I.C.C. 806—have been cited to support the order of the Commission. In many respects the factual situation in these cases was different from that at hand. While we accord deserved respect and deference to the judgment of the Commission, we cannot follow those determinations where they differ from ours.

The orders of the Commission must be vacated as prayed by the plaintiff employees. The action will be remanded with instructions that they be treated as coming within the ambit of § 5(2) (f).

Order vacated and remanded.