Larry ZAPP, et al., Plaintiffs-Appellants,

v.

UNITED TRANSPORTATION UNION
and Consolidated Rail Corporation,
Defendants-Appellees.

No. 81–3072.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 3, 1982.

Decided Feb. 6, 1984.

Dean E. Richards, Indianapolis, Ind., for
plaintiffs-appellants.

John P. Price, Bingham, Summers, Welsh & Spilman, William A. Wick, White, Raub, Wick & Riegner, Indianapolis, Ind., for defendants-appellees.

Before CUMMINGS, Chief Judge, CUDAHY, Circuit Judge, and TIMBERS, Senior Circuit Judge.*

CUDAHY, Circuit Judge.

Plaintiffs appeal from the judgment of the district court dismissing their Third Amended Complaint against their Union, the United Transportation Union (the "UTU"), and their employer, the Consolidated Rail Corporation ("Conrail"). We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. *The Parties*

Plaintiffs are 126 individual engineers and trainmen (this is not a class action) formerly employed by the Indianapolis Union Railway Company (the "IU"), a "beltline" industry and interchange railroad circling Indianapolis. The IU was originally a wholly-owned subsidiary of the Pennsylvania Railroad. On February 1, 1968, the New York Central Railroad was merged into the Pennsylvania to form the Penn Central Transportation Company (the "Penn Central"), and the IU became a subsidiary of the Penn Central by virtue of the change in name of the parent. The parties agree that, despite the intercorporate ties, the IU at all times operated as a unit separate from the Pennsylvania and the Penn Central. Defendant Conrail, an entity created by the Regional Rail Reorganization Act of 1973 (the "3R Act"), 45 U.S.C. § 701 *et seq.*, was formed to acquire the assets of a number of bankrupt railroads. On April 1, 1976, the assets of the Penn Central and the IU were conveyed to Conrail, and employees of both railroads were offered employment with Conrail.[1] Defendant UTU was formed in 1969 by the merger of various craft unions, and thereafter represented ground service employees on the IU; from 1969 to 1976 the Brotherhood of Locomotive Firemen and Engineers represented IU firemen and engineers, and, since 1976, the UTU has represented the firemen, while the engineers have been represented by the Brotherhood of Locomotive Engineers. The UTU denies any responsibility for plaintiffs who are locomotive engineers.

## II. *The Claims*

Prior to the conveyance of the various rail properties to Conrail, the UTU and Conrail signed a collective bargaining agreement dated December 18, 1975, consolidating the seniority rosters of the various acquired railway lines. Plaintiffs allege that as a result of this agreement, they received a seniority date of April 1, 1976 (the date of the conveyance to Conrail), while employees of the former Penn Central received a February 1, 1968 seniority date (the date of the merger of the New York Central into the Pennsylvania). Plaintiffs further allege that as a result of the disparity in seniority dates, former IU employees are consistently bumped by former Penn Central employees with later dates of hire and are more often furloughed or awarded less favorable job assignments. Plaintiffs therefore seek to have the seniority provisions of the collective bargaining agreement between Conrail and the UTU reformed to give them February 1, 1968 seniority throughout their Conrail seniority district.

Plaintiffs assert three discrete complaints against the Union:[2] (1) The Union violated a 1974 Interstate Commerce Commission ("ICC") order protecting the rights of employees of subsidiaries of railroads involved in the Penn Central merger. (2) Section 504(b) of the 3R Act, 45 U.S.C. § 774(b),

---

* The Honorable William H. Timbers, Senior Circuit Judge for the Second Circuit, is sitting by designation.

1. Other railroads were also acquired by Conrail, but only the IU and the Penn Central are relevant to this litigation.

2. Plaintiffs' discursive complaint is not divided into counts, but, according to plaintiffs' brief on appeal, the district court was correct in concluding that these were plaintiffs' distinct claims.

requires that local unions be involved in negotiations relating to the seniority rights of employees affected by mergers, and this requirement was not met.[3]  (3) The Union breached its duty of fair representation by failing to protect the seniority rights of plaintiffs, who were employees of a small railroad and a numerically small contingent within the UTU.

The district court dismissed the first claim on alternative grounds.  First, if the claim is construed as a suit to enforce an order of the ICC, the claim is jurisdictionally defective on account of plaintiffs' failure to join the United States, a necessary party under the Urgent Deficiencies Act, 28 U.S.C. § 2321 *et seq.*  Second, even if the enforcement claim were properly in federal court, the ICC order could not be enforced until plaintiffs' rights under the order are clarified, and that is a matter appropriately referred to the ICC under the doctrine of primary jurisdiction.

The claim under Section 504(b) of the 3R Act was dismissed for failure to state a claim since neither the statute nor the cases interpreting it provide support for plaintiffs' contention that local rather than system-wide bargaining over seniority rights is required.  The duty of fair representation claim was dismissed on the ground that plaintiffs had made only conclusory allegations of discrimination.

Two claims were advanced against Conrail: (1) Conrail violated the 1974 ICC order in establishing the consolidated seniority rosters.  (2) Conrail failed to follow the requirements of Sections 4 and 5 of the 3R Act.  In addition there was a general allegation that Conrail had acted "in concert with" the Union in negotiating seniority.  The first claim is essentially the same as the first claim raised against the Union, and Judge Dillin dismissed it on the same alternative jurisdictional grounds.  The second claim was dismissed for vagueness; the 3R Act contains no Section 4 or 5.[4]

On appeal, plaintiffs argue that the duty of fair representation claim was improperly dismissed, that the 1974 ICC order may be enforced without clarification by the ICC, that the United States either is not a necessary party to an enforcement action or should have been joined by the district court under Rule 19, FED.R.CIV.P., and that for purposes of a motion to dismiss, plaintiffs' allegations about the meaning of the ICC order and the 3R Act must be taken as true.  Plaintiffs also argue both that the district court should have converted defendants' motion to dismiss to a motion for summary judgment and that the court improperly considered matters outside the pleadings in ruling on the motion to dismiss.[5]

## III.  *Background*

While there is at least a superficial appeal to plaintiffs' claim that there is an obvious injustice in the disparity between

---

**3.** It is unclear whether the claim against the UTU is that it should have refrained from negotiating on plaintiffs' behalf or should have taken affirmative steps to include the IU locals in the negotiations.  Plaintiffs do not claim that Conrail was at fault in negotiating with the wrong representatives.

**4.** We approve the dismissal of this claim.  It is conceivable that plaintiffs meant to refer to some other sections of the 3R Act or to Section 5 of the ICC Act;  Section 5(2)(f) of the ICC Act contains the labor protection provisions at issue in the 1974 ICC order.  However, even under the liberal requirements of notice pleading, defendants should not have to guess about the statutory basis for this lawsuit.  Plaintiffs have had three opportunities to amend their complaint, and this court ought not to speculate further about the real nature of this claim.

**5.** The thrust of this contention is not entirely clear.  Some of plaintiffs' claims were dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction, and some under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  A 12(b)(6) motion is to be treated as a motion for summary judgment "when matters outside the pleadings are presented to and not excluded by the court."  Rule 12(b), FED.R.CIV.P.  This provision by its terms is not applicable to a 12(b)(1) motion.  The only extraneous evidentiary material in the record is a deposition extract included by plaintiffs in a memorandum in opposition to a motion to dismiss.  It is clear from the district court's entry that neither this nor any other factual material was considered by the district court.

the February 1, 1968 and April 1, 1976 seniority dates, plaintiffs' claims must be evaluated in the context of twenty years of rail consolidations within the Northeastern United States. In each successive merger or acquisition culminating in the formation of Conrail, redundant lines and facilities—and, unfortunately, jobs—have been eliminated. Such streamlining is frequently an element of consolidation into a more economically viable unit, and the ICC is charged with determining when such consolidation, appropriately hedged with labor protective conditions, is in the public interest. As an integral part of these organizational changes, previously independent seniority rosters have been consolidated.

Inevitably, at least some workers will be less well off than they were prior to facility or seniority consolidation, not because of legally cognizable wrongdoing, but because they had the ill fortune to be part of a declining industry. And, of course, a union cannot, in a situation of job contraction, easily satisfy all its members. Plaintiffs seem undoubtedly to be less well off than

they were prior to the acquisition by Conrail. But the question for us in reviewing the dismissal of their complaint is whether they have alleged cognizable injury (and whether they have sued appropriate parties). Accordingly, some delving into the history of the ICC orders and the successive rail and seniority consolidations is necessary in order to determine whether plaintiffs have enforceable claims under the ICC orders or have adequately alleged that the UTU discriminated against them.

## A. Seniority and Facility Consolidation

As we understand it, the present consolidated seniority system is the end result of a succession of mergers and acquisitions under which each employee retained seniority rights on his prior seniority district and acquired new seniority rights, as of the date of merger, throughout the new consolidated seniority district formed.[6] Such a procedure for consolidating seniority rosters seems, on the face of it, one acceptable approach to the problem.[7]

---

**6.** A consolidated seniority district might be composed of several prior seniority districts belonging to each of the merging (or acquired) lines. An individual trainman would thus retain "prior right" seniority in his original district and would acquire new rights in seniority districts formerly belonging to another railroad and in such other seniority districts of his own line as might be assigned to the new district. Since "prior right" seniority is specific to a particular section of track, prior rights are extinguished if the track is abandoned.

Seniority rights then held are typically guaranteed by the terms of the collective bargaining agreement accompanying each merger or acquisition. The legislation creating Conrail similarly provided that the procedure for determining Conrail system seniority "shall, to the extent possible, preserve [the employees'] prior seniority rights...." 45 U.S.C. § 774(b)(4). Thus, an employee with a lengthy employment history might, after a succession of such consolidations, have seniority throughout the most recently formed district as of the date of its formation, "prior right" seniority throughout a previously consolidated sub-area as of the date of that consolidation, and "prior prior right" seniority as of his date of hire on his original seniority district. In theory, with gradual employee retirement, a seniority roster will eventually be determined only by the date of hire into the newest consolidated district.

**7.** This territory-specific system for consolidating seniority rosters has been used in a number of railroad mergers. Another possibility for seniority consolidation involves "dovetailing," or the compiling of a single roster with workers listed in the order of their dates of hire; under this plan, no employee retains any superior right to work on track within his prior seniority district. Another possible system uses "work equity" seniority consolidation. This was the system used in the merger that resulted in the formation of the Burlington Northern; see *Augspurger v. Brotherhood of Locomotive Engineers,* 510 F.2d 853, 855–56 (8th Cir.1975), for a detailed description of variations on this theme. Under this approach, the total number of slots on the consolidated roster allocated to each of the merging railroads (or to the various seniority districts of any one railroad) reflects the relative amount of work (typically measured by engine hours) brought into the new consolidated district from each prior district. No employee retains any claim on work in his prior district. Individual employees obtain work on the slots allocated to their prior district according to their standing on their prior district rosters. We do not understand plaintiffs to be complaining about the choice of a territory-specific method of seniority consolidation for the Penn Central and Conrail consolidations. Rather, plaintiffs apparently want only to be assigned the same seniority date as former Penn Central employees.

An agreement dated December 21, 1966 between the Pennsylvania and the New York Central Railroads and their employees represented by the Order of Railway Conductors and Brakemen and the Brotherhood of Railway Trainmen provided for the establishment, in the event of merger, of new Penn Central seniority districts, to be arranged so that employees in the new districts would retain prior rights to employment in their preexisting seniority districts. A November 16, 1967 Implementing Agreement between the same parties specifically provided for the creation of Penn Central Seniority District No. 2, Southwestern, which was to encompass the Indianapolis Terminal Yards of the Pennsylvania and New York Central Railroads (and three other Pennsylvania and fifteen other New York Central prior right districts). Geographically, District No. 2 is roughly described as a triangle with vertices at Indianapolis, Peoria and Cairo, Illinois. The effect of this agreement was to give former employees of the Pennsylvania and New York Central Railroads seniority throughout Penn Central Seniority District No. 2, effective as of the date of merger, February 1, 1968, while such employees would at the same time retain prior rights within their respective former seniority districts. Priority among the large group of employees with the same Penn Central seniority date who might be competing for jobs on track on which none of them had prior right seniority would be determined by their earliest retained seniority date as a trainman (generally the employee's date of hire). Plaintiffs were not directly involved in the Penn Central merger, and, hence, acquired no seniority in Penn Central Seniority District No. 2. Conrail; not yet in existence, was of course not a party to any of these agreements.

In advance of the conveyance of the Penn Central to Conrail, a Single Implementing Agreement was entered into on July 23, 1975 between Conrail and various craft unions representing employees of the railroads in reorganization. All employees of railroads acquired by Conrail would be offered employment with Conrail and would not lose seniority rights then held. A December 18, 1975 collective bargaining agreement between defendants Conrail and the UTU provided for the creation of eight Conrail seniority districts, including District B, Southwestern, which encompassed all of the former Penn Central Seniority District No. 2 (four Pennsylvania road and yard prior right districts and sixteen former New York Central road and yard prior right districts) as well as all of the territory of the former Indianapolis Union Railway Company. This Agreement provided that all employees with standing on prior seniority district rosters would retain their prior rights throughout the territory encompassed by their prior seniority districts; in addition these employees would gain new rights in territories which were previously separate and unrelated. This appears to be the same system used for Penn Central seniority consolidation. Thus, former Pennsylvania and New York Central employees who were in Penn Central Seniority District No. 2 would acquire an effective April 1, 1976 seniority date in the prior Indianapolis Union seniority district (where they previously had no rights), and would retain February 1, 1968 seniority in Penn Central District 2 territories ("prior" rights), as well as whatever seniority they had on their old Pennsylvania or New York Central districts ("prior prior" rights). Former Indianapolis Union employees, on the other hand, acquired April 1, 1976 seniority in all former Pennsylvania and New York seniority districts encompassed by former Penn Central Seniority District No. 2 (where they previously had no rights) and retained their IU territory seniority.

A June 23, 1976 Agreement between the UTU and Conrail provided for the consolidation of the Indianapolis yard facilities of the former Penn Central and IU railroads and for the allocation of jobs in accordance with a selection order list designed to insure that overall, former Pennsylvania, New York Central, and IU employees received a proportionate share (based on engine hours worked) of the available jobs. The proportions appear to be New York Central, 40%,

and 30% each for the IU and Pennsylvania.[8] Prior seniority rosters for each line determine which individual IU employees are assigned the jobs allocated to the IU. The Penn Central February 1, 1968 and Conrail April 1, 1976 seniority dates would seem to play no role in establishing the selection order list.

In view of this history of seniority and facility consolidation, the allegation that Indianapolis Union employees have April 1, 1976 seniority and all other employees have February 1, 1968 seniority seems to us to cover only part of the story. If we are correct about the operation of the various successor seniority districts, the picture is complex. The resolution of any given seniority conflict involving "road" or "track" jobs apparently depends primarily on the origin of the track where the conflict arises. Thus (for example) on a line near Indianapolis once owned by the Pennsylvania Railroad, a former Indianapolis Union employee would have April 1, 1976 seniority, a former New York Central employee February 1, 1968 seniority, and a former Pennsylvania Railroad employee might have seniority back to his date of hire well before February 1, 1968. In any conflict among three such hypothetical employees, the Indianapolis Union worker loses. On the other hand, if the track in question were previously owned by the Indianapolis Union Railroad, the IU employee would have whatever seniority he had on the old Indianapolis Union seniority roster, and the hypothetical Pennsylvania and New York Central alumni would both have only April 1, 1976 seniority. Under this latter hypothetical scenario, it is the Indianapolis Union man who should win. At oral argument, the Union asserted that this would indeed be the case. If the seniority conflict involves consolidated "yard" jobs, prior ownership of the facility is apparently irrelevant, and the amount of work contributed by each carrier determines the number of jobs allocated to that line's employees. Employees from a line which contributed little work would have fewer slots on the selection list, and thus a trainman from that line might have lower job priority than a former employee of the more heavily used yard who had a later date of hire. Even if, as seems to be the case in Indianapolis, several merging lines contributed equal amounts of work, and thus obtained equal numbers of slots, the distribution of dates of hire within each prior seniority roster could lead to situations in which an employee on one line with a later date of hire takes precedence over an employee from another line with an earlier date of hire.

Plaintiffs' Amended Complaint lists several pages of instances in which a former Indianapolis Union employee is bumped by, or furloughed in favor of, a former Penn Central employee with a later date of hire. These examples may apply to our first hypothetical—Indianapolis Union employees seeking to compete for work on track formerly owned by the Penn Central. The Complaint gives us no information on this point, but at oral argument plaintiffs claimed, contrary to our hypothesis, that all instances involved jobs on former Indianapolis Union lines. It may well be that these are yard jobs. (No one has explained to us what portion of the old Indianapolis Union Railroad is "road" and how much "yard.") The Complaint also asserts that the desirable "long pool" jobs (e.g., Indianapolis to St. Louis, a prior Penn Central route) are awarded to Penn Central employees with later dates of hire. Because IU employees would have no prior right seniority on the track involved, this result is consistent with a territory-specific system of prior right seniority. At oral argument plaintiffs additionally claimed that the IU lines have been removed from service (although the date of this development has not been indicated), so

---

**8.** This "work equity" system (*see* n. 7 *supra*) is the system typically used in consolidating yard facilities. In contrast to the prior right system used in the Penn Central and Conrail *track* job roster consolidations (in which prior rights are lost if the track is abandoned), employees have no "prior right" to jobs on their former *yard* facilities. However, even if a terminal yard formerly owned by one of the merging carriers is completely abandoned, employees from that prior seniority district are entitled to a proportionate share of the remaining jobs.

the sole seniority date applicable to former IU employees is April 1, 1976. We presume this is a reference to road jobs.

### B. The ICC Orders

Section 5(2)(f) of the ICC Act, 49 U.S.C. § 5(2)f, since amended and recodified at 49 U.S.C. § 11347 (1978), provides that a rail merger will not be approved by the ICC unless "a fair and equitable arrangement to protect the interests of the railroad employees *affected*" (emphasis added) is made. Accordingly, labor protective conditions were an important aspect of the planning begun in the early 1960's for the eventual merger of the New York Central into the Pennsylvania.[9] A May 20, 1964 agreement negotiated by the two merger applicants and 23 unions representing 75% of their employees required job retention without diminution or impairment of compensation, working conditions, or fringe benefits (essentially the conditions of the 1936 Washington Job Protection Agreement); further, the Penn Central would have only limited freedom to reduce the work force, and, while the merged company could transfer work throughout its system, it had to pay severance allowances to any workers who chose not to move.

An ICC Order dated April 6, 1966, 327 I.C.C. 475, which authorized the Penn Central merger (the "merger report"), adopted these 1964 labor protective conditions [10] and made them applicable to Pennsylvania and New York Central employees who had not been represented in the 1964 negotiations and to employees of other carriers which the ICC might subsequently require to be included in the merger. Plaintiffs, who were not involved in the Penn Central merger, had of course not been represented. After the February 1, 1968 merger, various labor organizations sought to have the labor protective conditions extended to employees of the subsidiaries of the Penn Central.[11] The case proceeded (despite the Penn Central's 1970 petition for reorganization under section 77 of the Bankruptcy Act) and in 1971 an Administrative Law Judge recommended that all the subsidiaries be covered by the 1964 merger protective conditions incorporated in the merger report. Exceptions were filed by the trustees of the Penn Central and by numerous labor organizations (including the UTU) and subsidiaries (not including the Indianapolis Union). On October 18, 1974 the ICC issued the Order, Finance Docket No. 21898, 347 I.C.C. 536, that is the focus of plaintiffs' lawsuit.

Two classes of subsidiaries were considered in the 1974 order: those which had become integral operating units of the Penn Central system and those (including the Indianapolis Union) that continued to operate as independent railroads after the merger, albeit under the legal ownership of the Penn Central. There was general agreement that the former group of subsidiaries, being involved in and directly affected by the merger, were entitled to the same job protections as New York Central and Pennsylvania employees; the only dispute concerned the "independent" subsidiaries.

The order is clear enough in its statement of policy. The Commission began with the premise that to be entitled to the protections of 5(2)(f), an employee need only meet two criteria: he must be an employee of some railroad engaged in common carriage,

---

**9.** The formation of Conrail was not a merger pursuant to Section 5(2) of the ICC Act. Rather, it was created by independent legislation, the 3R Act. ICC orders governing labor protective conditions of the Penn Central merger are not applicable to Conrail.

**10.** It should be noted that these labor protective conditions set forth the rights of the employees *vis-a-vis* the railroad, not *vis-a-vis* one another. While section 5(2)(f) has been held to require a fair seniority consolidation system, *see Anderson v. United Transportation Union,* 557 F.2d 165 (8th Cir.1977), relative position on

a consolidated seniority roster is primarily a problem of priority among employees once the union and employer have determined the total number and type of jobs available and is not directly addressed by these labor protective orders.

**11.** The New York Central and the Pennsylvania each had a number of subsidiaries which, like the Indianapolis Union, had become subsidiaries of the Penn Central. Conrail's brief asserts that there are 57 such subsidiaries.

and must be affected by the merger in question. Protection is not limited to employees of the carriers directly involved in the merger, but applies to all railroad employees affected. Since there is usually little difficulty determining whether or not an individual is an employee of a common carrier, the only real question is whether he has been "touched sufficiently" by the transaction. 347 I.C.C. at 546, citing *Railway Labor Executives' Association v. United States,* 216 F.Supp. 101 (1963). Under this standard, the employees of the independent subsidiaries were eligible for 5(2)(f) protection.

The order was considerably less clear about how this statement of entitlement might translate into benefits for individual employees. The order stated only that "retroactive and prospective application of the merger report conditions to some of the employees of the subsidiaries" would be required. 347 I.C.C. at 551. Presumably this is a reference to "affected" employees. The order provided no guidelines for determining when an employee is to be deemed sufficiently "affected."

The trustees of the Penn Central promptly asked for reconsideration, arguing that the labor protective conditions were negotiated in the context of the Penn Central merger and should not be read to require employment guarantees and severance benefits for railroad workers who were not operationally part of the Penn Central system. The Commission responded, by order dated April 10, 1975, that the trustees had misunderstood the prior order, which held that employees of the subsidiaries "are entitled to benefits under the § 5(2)(f) labor conditions . . . only in those instances where they are shown to be directly and adversely affected by the merger" of the New York Central into the Pennsylvania, and that whether an employee was indeed so affected was to be determined by arbitration. This is apparently a reference to compulsory arbitration before the National Railroad Adjustment Board.

## IV. *The Merits*

With this background in mind, we turn now to plaintiffs' specific claims.

### A. *The ICC Enforcement Claim*

At oral argument, members of the panel repeatedly asked why plaintiffs thought that the arbitration requirement of the 1975 order did not apply to them. The answer was that there was nothing to be determined by arbitration because the 1974 order itself, and of its own force, gave plaintiffs the February 1, 1968 seniority date they sought, and their only problem was in obtaining enforcement of that 1974 order.

It appears to us that much of the confusion in this case has arisen because the parties are concentrating on very different aspects of the 1974 order (as modified by the 1975 order), and consequently neither side is really addressing the arguments raised by the other. We conclude that the orders provide that, if plaintiffs are "affected" by the merger of the New York Central into the Pennsylvania (a matter to be determined by arbitration), they are entitled to the protections specified in the 1966 merger report. This also is how defendants read the orders. These section 5(2)(f) protections include the preservation of jobs, wages, and fringe benefits that might otherwise be lost in the course of a merger. However, as we have already observed, *supra* n. 10, merger protective conditions, which circumscribe the carrier's ability to reduce labor costs, have little to do with seniority directly; that is a matter determined by a collective bargaining agreement, which determines which employees are entitled to the available jobs.

Given that plaintiffs are interested only in seniority, their lack of interest in arbitration proceedings designed to determine their right to 5(2)(f) protections makes a certain amount of sense; they are not arguing about merger protection, the ostensible subject matter of the ICC orders. Rather, they have focused on the language stating that employees of the subsidiaries are to be considered employees of the Pennsylvania, and they have built their case for Pennsyl-

vania seniority on this language. Specifically, they argue that by referring to them as Pennsylvania employees, the ICC ordered that plaintiffs were to be considered Pennsylvania employees for purposes of collective bargaining over seniority rights. That is, the 1974 order meant that in 1975 the IU employees should have been integrated into the Penn Central seniority rosters (with Pennsylvania employee 1968 seniority) before the Conrail seniority list was created. Defendants were allegedly derelict in failing to recognize plaintiffs' entitlement to Pennsylvania employee status at the time of the 1975 collective bargaining agreement.

■ We think this is a rather strong implication to be derived from the use of the word "employee" in the 1974 order. We have no idea whether the 1974 order can properly be construed in this fashion. We therefore cannot act to enforce the 1974 order so construed until we know unambiguously what rights the order accords plaintiffs and whether the order has indeed been violated. That is the sort of determination (involving an extremely complex ICC-supervised merger) classically committed to agency discretion under the doctrine of primary jurisdiction. *See Far East Conference v. United States,* 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952); *Texas & Pacific R. Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907). We therefore approve the district court's decision to decline jurisdiction at this time and to dismiss the complaint against both the Union and Conrail insofar as the complaint is construed as a suit for enforcement of the 1974 order interpreted as an automatic award of February 1, 1968 seniority. To determine whether the 1974 order grants them the right to Pennsylvania employee seniority status, plaintiffs may petition the ICC for a declaratory order. After the ICC has clarified plaintiffs' rights, a suit in federal court to enforce the order may be entirely prop-

er.[12] The primary jurisdiction doctrine simply defers court consideration until the administrative agency has had an opportunity to evaluate the claim.

In view of our holding that this lawsuit cannot properly be construed now as one for the enforcement of an ICC order, we do not need to decide whether, for an action predicated on 28 U.S.C. § 1336, the United States must be a party by virtue of the Urgent Deficiencies Act or whether, under our decision in *Carothers v. Western Transportation Co.,* 554 F.2d 799, *reh. denied,* 563 F.2d 311 (7th Cir.1977), the United States need not be involved. It is enough here to point out that the United States is, of course, not a required party when the case, under the doctrine of primary jurisdiction, is referred for adjudication to an agency of the United States.

If plaintiffs do not wish to pursue their argument that the 1974 order entitles them to February 1, 1968 seniority, they may wish to determine what rights to merger protection they do have under the 1974 and 1975 orders. For this they must seek arbitration before the Adjustment Board. It is not immediately obvious why the Indianapolis Union employees would be considered *directly* affected by the Penn Central merger; if the Penn Central had not collapsed, the IU would presumably have continued to operate independently, and plaintiffs would have had no reason to seek relief under the 1974 ICC order. Plaintiffs' problems arise *directly* from the formation of Conrail, so it is only at one step removed that the Penn Central merger can be said to be relevant to them; "but for" that merger and accompanying seniority consolidation, workers with whom plaintiffs now compete would not have obtained February 1, 1968 seniority. It is not even clear to us that plaintiffs have adequately alleged "but for" causation. The real problem seems to be that, while all employees gained Conrail seniority

---

**12.** We note that the district court was not requested to, nor did it elect to, follow the apparent option of referring the question to the ICC for determination. In such cases, the district court referring the question then has exclusive jurisdiction over civil actions arising from the new ICC order. *See* 28 U.S.C. § 1336(b). We express no opinion as to whether the jurisdictional posture of the case would have brought § 1336 into play.

(throughout their new consolidated seniority district) effective April 1, 1976, prior right seniority is territory-specific. Given that such a seniority consolidation plan was adopted, any merger between the IU and a larger railroad would have left the IU employees with a seniority disadvantage throughout the majority of the lines in the resulting system—unless the boundaries of the new seniority district were carefully selected to encompass equal amounts of territory from the larger and the smaller railroad, and that, of course, is not the case here.

It is conceivable that the Penn Central merger itself did have an *indirect* effect on plaintiffs in that New York Central and Pennsylvania employees, who retained "prior prior right" seniority on their own lines thereby obtained February 1, 1968 "prior right" seniority on each other's lines; the IU employees had no such opportunity to expand their seniority territory prior to the formation of Conrail. We do not know whether such retrospective "but for" causality amounts to the IU employees being "affected" by the merger of the Penn Central within the meaning of Section 5(2)(f) of the ICC Act and the 1974 and 1975 ICC orders, but plaintiffs are certainly entitled to go to arbitration to find out.

### B. The Duty of Fair Representation Claim

The duty of fair representation claim against the UTU at least states a claim more amenable to resolution in the first instance by a federal court. Plaintiffs have made several different allegations that can collectively be characterized as alleged breaches of the duty of fair representation: Paragraph 28 of the Third Amended Complaint refers to the Union's failure "to act in good faith as a collective bargaining agent" and failure to give plaintiffs "fair representation in negotiating their seniority rights with Defendant Conrail."[13] Paragraph 27 alleges that in giving IU employees April 1, 1976 seniority and Penn Central

---

13. In addition, ¶ 28 alleges that Conrail "did not act in good faith" because it failed to follow Sections 4 and 5 of the 3R Act and the various ICC Orders. We have already approved the dismissal of the claim concerning the 3R Act, *supra* n. 4, and have concluded, *supra* n. 9, that the labor protective provisions of the 1974 ICC order are not applicable to Conrail. Insofar as the complaint can be construed as alleging that Conrail has some common law duty to act in good faith to protect plaintiffs' interests, we approve the dismissal of this claim. An employer's duty in labor negotiations is to protect its own interests (within the limits of the law). *Harrison v. United Transportation Union,* 530 F.2d 558, 561 (4th Cir.1975), *cert. denied,* 425 U.S. 958, 96 S.Ct. 1739, 48 L.Ed.2d 203 (1976). We similarly conclude that an allegation that Conrail acted "in concert" with the Union fails to state a claim. We believe that to be liable on a "concerted" denial of fair representation theory, Conrail would have had knowingly to have assisted the Union in a breach of its duty. This is not alleged. *See O'Mara v. Erie Lackawanna R. Co.,* 407 F.2d 674 (2d Cir.1969), *aff'd sub nom. Czosek v. O'Mara,* 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970) (because carrier was not alleged to be implicated in the union's breach of duty, the complaint against the carrier was properly dismissed, and any recourse against carrier was before National Railroad Adjustment Board).

Conrail also argues on appeal (the point was not dealt with by the district court) that plaintiffs' claim for reformation of the seniority roster should be dismissed because the claim is a "minor dispute" subject to the exclusive jurisdiction of the National Railroad Adjustment Board. *See* 45 U.S.C. § 153(i). We disagree. A minor dispute is one concerning the interpretation or application of the terms of a collective bargaining agreement. *See, e.g., United Transportation Union v. Baker,* 499 F.2d 727 (7th Cir.), *cert. denied,* 419 U.S. 839, 95 S.Ct. 69, 42 L.Ed.2d 66 (1974) (whether a computer printout could be substituted for the "crewboard" required by the collective bargaining agreement); *Slagley v. Illinois Central R. Co.,* 397 F.2d 546 (7th Cir.1968) (whether injured conductor was properly deprived of seniority rights upon transfer to less arduous job). The case before us does not involve a dispute over the meaning of the collective bargaining agreement between the UTU and Conrail; it is perfectly clear to all concerned that under the agreement, plaintiffs' seniority throughout the vast majority of the territory of Seniority District B is April 1, 1976, while former Pennsylvania and New York Central employees have seniority at least as far back as February 1, 1968 throughout the same territory. What plaintiffs object to is the fact that the collective bargaining agreement establishes this result. (This "minor dispute" issue is somewhat academic in view of the fact that we have already dismissed on other grounds all of the claims against Conrail.)

employees February 1, 1968 seniority, the Union was in violation of both the ICC Act and the duty of fair representation. At oral argument, plaintiffs asserted that the IU lines no longer exist, and this appears implicitly to state a claim that the Union acquiesced in wiping out plaintiffs' only prior right seniority territory.

■ A complaint should be dismissed on the pleadings only if "it appears that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). As we noted above, we do not know what seniority rights, if any, the 1974 ICC order accords plaintiffs, and they have not gone to arbitration to determine whether they are "affected" by the Penn Central merger within the meaning of the 1974 and 1975 ICC orders. It necessarily follows that plaintiffs could not at present state a claim for breach of the duty of fair representation if the only allegation were that the Union failed to apply the ICC orders as plaintiffs interpret them.[14]

■ It is, however, entirely possible that plaintiffs could prove that the Union discriminated against them in agreeing to a seniority consolidation plan that left employees of a very small railroad as low men on the resulting totem pole or did not attempt to alter the seniority system once the IU lines were abolished.[15] Plaintiffs have adequately alleged hostile discrimination against them. We accordingly disapprove this much of the district court's dismissal of the breach of duty of fair representation claim.

This decision does not, however, dispose of the question of who should decide the duty of fair representation case. The Eighth Circuit, in *Augspurger v. Brotherhood of Locomotive Engineers,* 510 F.2d 853 (8th Cir.1975), was faced with a similar problem. Plaintiffs in that case were members of one of the Northern Pacific seniority districts involved in the Burlington Northern merger. They alleged that their union had violated its duty of fair representation by agreeing to a work equity seniority consolidation scheme. Their former district had had relatively little traffic; they would have been better off under a pure date of hire seniority integration plan. The district court had dismissed the complaint, holding that the fair representation doctrine does not apply to cases arising out of mergers. The Eighth Circuit rejected this reasoning, concluding that a proper fair representation case is an exception to the doctrine of primary jurisdiction, even in merger cases.[16] However, since plaintiffs had not adequately alleged intentional or hostile conduct on the part of the union, the court concluded that the claim really dealt only with the conditions of the merger and affirmed the dismissal on primary jurisdiction grounds.

Defendant UTU argues that *Augspurger* is exactly on point and that the IU employees' fair representation claim should be dismissed on grounds of primary jurisdiction. We disagree. Plaintiffs complain that in negotiating seniority rights, their union de-

---

**14.** If the ICC confirms plaintiffs' interpretation of the 1974 order, plaintiffs might still not have a duty of fair representation claim based on application of the 1974 order; the Union would likely not be liable for failing to give the order an interpretation that we are unable to give the 1974 order on its face.

**15.** On a motion to dismiss, the well-pleaded allegations of the complaint are to be taken as true. Information mentioned in memoranda filed before the district court, and asserted before this court for the first time at oral argument, is neither well-pleaded nor part of the complaint. However, in the hopes of bringing this litigation to a conclusion, and in the interests of making sense of this confusing complaint, we will assume the truth of this allegation.

**16.** The court cited this circuit's decision in *Oling v. Airline Pilots Association,* 346 F.2d 270 (7th Cir.1965), as holding that the Seventh Circuit is unwilling to recognize a fair representation exception to the primary jurisdiction doctrine in merger cases. We do not consider that to be a fair reading of *Oling.* The only issue on appeal there was whether plaintiffs, who did not appeal a Civil Aeronautics Board decision consolidating seniority rosters, could collaterally attack the C.A.B. decision by filing an independent suit in federal district court.

liberately discriminated against employees of a small railroad in order to benefit the larger Penn Central constituency. They also allege that they have essentially no seniority standing because of the abandonment of the Indianapolis track and lack Conrail seniority sufficient to bid for long pool jobs. These claims adequately (although inartfully) state a fair representation claim.

We therefore remand this issue for further proceedings.[17] We do note, however, that the district court may well determine that even this duty of fair representation claim cannot be resolved without referring some or all issues in the case to the ICC under the primary jurisdiction doctrine. Plaintiffs' allegations are so vague that it may develop that all issues are inextricably entwined with matters properly decided by the ICC.[18]

### C. The Claim Under § 504(b) of the 3R Act

Plaintiffs argue that section 504(b) of the 3R Act, 45 U.S.C. § 774(b) (in effect at all times pertinent to this litigation, although repealed August 13, 1981), required that negotiations concerning seniority consolidation be conducted with individual union locals. Conrail and the UTU therefore allegedly erred in negotiating a single system-wide implementing agreement (the December 18, 1975 Agreement) establishing the Conrail seniority districts.

▇ Plaintiffs' sole support for this argument is an unreported decision, *Maloof v. United Transportation Union,* No. 78–3797 (E.D.Pa.1980), which dealt with § 504(d), not § 504(b) (the section relevant to seniority consolidation). *Maloof* held that Section

504(d), which refers to "collective bargaining agreements" for pay rates, work rules and work conditions, did not require a single system-wide agreement. In reaching this decision, the *Maloof* court specifically contrasted the language of 504(d), and its reference to "agreements" (plural), with the language of 504(b), which requires a "single implementing agreement." Even assuming that *Maloof* is the last word on the meaning of 504(d),[19] *Maloof* is thus itself an argument against plaintiffs' position on 504(b). In the absence of any case law supporting local seniority negotiation or any suggestion as to how Conrail could operate with a variety of seniority rosters that failed to mesh throughout a consolidated district, we must reject plaintiffs' argument. We approve the district court's dismissal of this count for failure to state a claim.

### V. Conclusions

Plaintiffs will have to decide what they wish to do next in light of the options set forth in this opinion. If they want to pursue their interpretation of the 1974 ICC order, they must go to the ICC under the primary jurisdiction doctrine to obtain a clarification resulting in an enforceable order. If they want to determine their rights as employees "affected" by the merger of the Penn Central in accordance with the 1975 ICC order, they should go to arbitration. If they want to litigate their fair representation claim against the Union, they may do so on remand.[20] Whatever course plaintiffs select, we strongly suggest that they try a more coherent presentation of their case; this court has struggled to fill the gaps in plaintiffs' arguments—an effort which should not be demanded of it.

**17.** On remand it will be necessary to determine whether all 126 plaintiffs were indeed represented by the UTU at the times in question.

**18.** In this event, the district court could appropriately enter an order staying proceedings until the ICC reaches a determination.

**19.** By an Act of October 14, 1980, Congress amended 504(d) to replace "collective bargaining agreements" with "single collective bargaining agreement."

**20.** We do note, however, that if plaintiffs do not raise all of their fair representation claims now, res judicata may bar a subsequent suit raising additional such claims. Plaintiffs may therefore first want a decision from the ICC in order to determine whether they have a viable fair representation claim against the Union for failure to apply the 1974 ICC order as plaintiffs interpret it.

AFFIRMED IN PART AND REVERSED AND
REMANDED IN PART.