Edward ENGELHARDT, Edward Rainey
and David Allen on behalf of them-
selves and as representatives of the
class herein defined, Plaintiffs,

v.

CONSOLIDATED RAIL CORPORATION
and International Brotherhood of Lo-
comotive Engineers and United Trans-
portation Union, Defendants.

No. 83–CV–1013.

United States District Court,
N.D. New York.

Sept. 12, 1984.

McGinn & Brown, P.C., Albany, N.Y., for plaintiffs; Arthur F. McGinn, Jr., Albany, N.Y., of counsel.

Dennis Alan Arouca, David S. Fortney, Philadelphia, Pa., for defendant Consolidated Rail Corp.; David S. Fortney, Philadelphia, Pa., of counsel.

Ross & Kraushaar Co., L.P.A., Cleveland, Ohio, Rowley, Forrest & O'Donnell, P.C., Albany, N.Y., for defendant International Brotherhood of Locomotive Engineers; Harold A. Ross, Cleveland, Ohio, Mark T. Walsh, Jr., Albany, N.Y., of counsel.

Fitzsimmons, French & French, Saratoga Springs, N.Y., Norton N. Newborn, Cleveland, Ohio, for defendant United Transp. Union; Paul V. French, of counsel.

## MEMORANDUM–DECISION and ORDER

MINER, District Judge.

### I

This action arises out of alleged violations by defendant Conrail of collective bargaining agreements, and various breaches of the duty of fair representation by defendants, United Transportation Union and the International Brotherhood of Locomotive Engineers following the 1968 merger of the Pennsylvania Railroad and the New York Central Railroad and the later inclusion of the New Haven Railroad in the merger agreement. In addition, plaintiffs allege a violation of an Interstate Commerce Commission order dealing with the merger and the protective rights to be afforded to the employees of the merging railroads. Jurisdiction is predicated upon Section 2 of the Railway Labor Act, 45 U.S.C. § 152, the employee protective provision of the Rail Passenger Service Act, 45 U.S.C. § 565, and section 11347 of the Interstate Commerce Act, 49 U.S.C. § 11347.[1] Before the Court are defendants' motions for summary judgment, Fed.R.Civ.P. 56(b).

### II

Plaintiffs Edward Engelhardt, Edward Rainey and David Allen bring this action on behalf of themselves and other former New Haven Railroad engine service employees[2] challenging their placement on consolidated seniority rosters for employment in prior New York Central Railroad Districts following the inclusion of the New Haven Railroad in the merger. Plaintiffs Engelhardt and Rainey currently are "locomotive engineers" employed by defendant Conrail Corporation ("Conrail"). Plaintiff Allen currently is employed as a locomotive engineer by Amtrak with flowback seniori-

---

1. At the time the events in question occurred, the governing provision was section 5(2)(f) of the Interstate Commerce Act. This provision has been replaced by 49 U.S.C. § 11347 with no significant alterations. Plaintiffs also assert jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337. Section 1331 gives the district courts original jurisdiction over constitutional and federal law

issues. Section 1337 provides the district courts with original jurisdiction over any civil actions arising under any congressional act regulating commerce or protecting trade.

2. Although denominated a class action, plaintiffs have yet to seek class certification pursuant to Fed.R.Civ.P. 23(c).

ty rights to Conrail.[3] Conrail is a Pennsylvania corporation organized on April 1, 1976, pursuant to the Regional Rail Reorganization Act of 1973 ("Reorganization Act"), 45 U.S.C. § 741. Conrail was organized for the purpose of consolidating a number of railroads in the northeast, including the former Penn Central Railroad.[4] Defendant International Brotherhood of Locomotive Engineers ("BLE") is the representative for Conrail engine service employees. Defendant United Transportation Union ("UTU") is the successor-in-interest to the Brotherhood of Locomotive Firemen and Engineers ("BLF & E") and currently is the representative for Conrail firemen and hostlers.

### A. The Penn Central Merger

On March 9, 1962, the Pennsylvania Railroad and the New York Central Railroad petitioned the Interstate Commerce Commission ("ICC"), pursuant to section 5(2) of the Interstate Commerce Act, to merge the entities and form the Pennsylvania Central Transportation Company ("Penn Central") and to acquire subsidiary railroads for such merger. On April 6, 1966, the ICC issued an order approving the proposed merger upon further negotiation of the merger conditions. *Pennsylvania Railroad-Merger-New York Central Railroad*, 327 I.C.C. 475 (1966). Condition 8 of the order required that the New Haven Railroad be included in the merger pending further approval of the terms for inclusion. *Id.* at 553. The ICC, on November 16, 1967, issued a second order approving the terms and conditions for the New Haven's inclusion. *Pennsylvania Railroad-Merger-New York Central Railroad*, 331 I.C.C. 643 (1967). The Penn Central merger thus was consummated on February 1, 1968. The New Haven Railroad, however, was not yet included in the merger. Courts twice declined to approve the ICC's inclusion agenda and remanded the matter to the ICC for

further consideration. *In re New York, New Haven and Hartford Railroad,* 289 F.Supp. 451 (D.Conn.1968); *New York, New Haven & Hartford Railroad First Mortgage 4% Bondholders' Committee v. United States,* 289 F.Supp. 418 (S.D.N.Y. 1968). The New Haven Railroad, therefore, was not included in the Penn Central until January 1, 1969, eleven months subsequent to the Penn Central's formation.

### B. The Merger Protective Agreement

On May 20, 1964, in light of their merger petition, the Pennsylvania and New York Central Railroads entered into an agreement with twenty-six labor organizations, including the BLE and BLF & E (UTU's predecessor). This agreement, entitled "Agreement for Protection of Employees in Event of Merger of Pennsylvania and New York Central Railroads" ("MPA"), formed the basis for protecting employee rights, privileges and benefits in relation to the merger. Section 1(b) of the agreement provides:

> [N]one of the present employees of either of the said Carriers shall be deprived of employment or placed in a worse position with respect to compensation, rules, working conditions, fringe benefits or rights and privileges pertaining thereto at any time during such employment.

Conrail Exhibit No. 4, at 3.

Section 2 of the agreement provides:

> In the event merger or control of other carriers not now involved in the aforesaid merger proceedings should be ordered by the Commission as a condition of its approval of the pending transaction, this Agreement shall be subject to amendment by the parties so as to provide the employee benefits set forth in Section 1 hereof to the employees of any such car-

---

**3.** Flowback seniority rights to Conrail from Amtrak employees in the northeast are granted pursuant to section 1165 of the Northeast Rail Service Act of 1981, 45 U.S.C. § 1113(a).

**4.** The need for the consolidation of the Penn Central and other northeastern and midwestern railroads was due to a massive collapse of regional railroads in the early seventies. *See Regional Rail Reorganization Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

rier controlled by or merged into the Merged Company.

*Id.* at 9.

In the initial ICC order approving the merger, the Commission expressly referred to the MPA in determining that it "does not render the proposed transaction inconsistent with the public interest." 331 I.C.C. at 544. Pursuant to this approval of the provisions of the MPA, the Pennsylvania and New York Central entered into an agreement with BLE and BLF & E on October 11, 1966, to more clearly define the application of the MPA to the engine service employees of the merging railroads and to expedite the consolidation of services and operations of the newly formed Penn Central. *See* Conrail Exhibit No. 2. This agreement established new seniority districts for engine service employees which would take effect upon consummation of the merger and also consolidated the current seniority rosters of the respective merging railroads.

Two further agreements entitled "Agreement for the Protection of Employees in Event of Inclusion of New York, New Haven and Hartford Railroad into the Pennsylvania, New York Central Transportation Company" and "Merger Protective Agreement-New Haven Employees," were entered into on December 20, 1966, and January 9, 1967, between the railroads and BLE and BLF & E respectively. The agreements enacted section 2 of the MPA by applying the provisions of the MPA to the inclusion of the New Haven Railroad in the merger. The agreements provided that "the terms and conditions of the said Merger Protective Agreement shall be applicable to the employees of the New Haven represented ... the same as though they were employees of the Pennsylvania or Cen-

tral." [5] December 20, 1966 Agreement, at 2; January 9, 1967 Agreement, at 2. The ICC order approving the inclusion of the New Haven Railroad in the merger expressly determined that the December 20, 1966, and January 9, 1967 agreements between the New Haven employees' representatives and the merging railroads "do not render the inclusion inconsistent with the public interest," 331 I.C.C. at 729, and thus approved application of the MPA to the employees of the New Haven. These agreements, negotiated between the merging railroads and the unions, became the basis for the establishment of the new seniority rosters and the initiation of this action.

### C. *The Seniority Roster*

On November 14, 1968, and pursuant to the October 11, 1966 agreement which initially organized the seniority districts for the ranking of engine service employees in relation to jobs available on former New York Central Railroad tracks, the two merging railroads and the BLE and BLF & E entered into a further agreement for the establishment of the Penn Central Seniority District No. 6—New York ("PC-6"). Conrail Exhibit No. 3. The agreement stipulated that effective February 1, 1968, New York Central engineers and firemen on ten former New York Central seniority districts, hostlers on three New York Central seniority districts, and hostlers on one Pennsylvania roster were given "prior rights" [6] protection as to positions in their former seniority districts. In addition, the engineers and firemen were given a February 1, 1968 seniority date for the entire PC-6 district.

On November 15, 1968, the same parties entered into an agreement regarding the status of New Haven employees in relation

---

5. A third similar agreement was signed by the railroads and other non-party unions on January 19, 1967.

6. Prior rights are based on employment with a predecessor railroad. *See Zapp v. United Transp. Union,* 727 F.2d 617, 620 n. 6 (7th Cir. 1984). If a consolidated seniority district constitutes several former seniority districts, "[a]n individual trainman would thus retain 'prior

right' seniority in his original district and would acquire new rights in seniority districts formerly belonging to another railroad and in such other seniority districts of his own line as might be assigned to the new district." *Id.* Prior rights are specific to a particular segment of track. *Id.* Thus, they are lost when the track is no longer used. *Id.*

to the new PC–6 seniority district. The agreement revised the October 11, 1966 agreement to include the New Haven and revised the PC–6 district to include former New Haven routes. In addition, individuals employed as firemen on the New Haven as of November 1, 1968, were placed on the PC–6 seniority roster as of October 31, 1968, which determined their relative promotional standing on the engineers seniority roster.

Finally, on April 29, 1969, the Penn Central entered into an agreement with the BLE and UTU, now the successor to the BLF & E, confirming the consolidation of the various railroads into the Penn Central. Under the provisions of this agreement, all New Haven engine service employees hired prior to November 1, 1968, were placed on a Combined Prior Right New Haven Seniority District Roster. Hostlers and helpers who were ineligible for firemen positions due to past New Haven contracts were placed at the bottom of this roster. New Haven engine service personnel were given prior rights as to their former New Haven seniority districts to the exclusion of all Pennsylvania and New York Central personnel as well as other New Haven engine service employees from other New Haven seniority districts. These employees also were given prior rights against Penn Central employees in relation to the entire former New Haven system. In regard to the PC–6 seniority district, New Haven employees were given a seniority rights date of November 1, 1968. Thus, due to this later seniority rights date, the entire Combined Prior Right New Haven Seniority District Roster was placed at the end of the PC–6 roster. If a New Haven employee sought a job in the Penn Central outside of New Haven routes, the PC–6 roster would be used to determine such rights as against former Pennsylvania and New York Central employees.[7]

On August 29, 1969, the PC–6 roster was posted for review. All protests were required to be filed by November 11, 1969.

Between February 1, 1968, and October 31, 1968, Penn Central hired seventy-eight new firemen employees for work within the PC–6 district. Because New Haven employees' seniority rights on the PC–6 roster did not accrue until November 1, 1968, these seventy-eight new employees were placed ahead of New Haven employees on the PC–6 roster.

### D. *Conrail's Involvement*

Due to the financial collapse of the Penn Central and other northeast and midwest railroads, Congress passed the Reorganization Act providing for the creation of Conrail and the transfer of the various bankrupt railroads' assets and employees to Conrail, including those of the Penn Central, 45 U.S.C. § 741. Conrail commenced operation of the Penn Central and other railroads on April 1, 1976.

New collective bargaining agreements were implemented, effective February 1, 1979, and superseded all prior Penn Central agreements. Under the new agreements, prior rights, as defined under the former Penn Central agreements, were preserved. Currently, a former New Haven engine service employee has a prior right to work on Conrail tracks effective April 1, 1976; a prior right to work on Penn Central tracks for work performed in the PC–6 seniority district effective November 1, 1968; an additional prior right to work on New Haven tracks effective October 31, 1968; and a further prior right to work on New Haven tracks that were within his former New Haven district, effective upon the date when he originally was hired by the New Haven.

### E. *Plaintiffs' Claims*

At the time of the inclusion of the New Haven in the merger, all three plaintiffs were employed by the New Haven as engineers or firemen. Their claims arise from the fact that former New Haven employees were given a seniority date of November 1, 1968 for placement on the PC–6 seniority roster, while former Pennsylvania and New

7. Prior to these agreements, New Haven engine service personnel only had seniority rights to

employment in their own home New Haven districts.

York Central employees were given a seniority date of February 1, 1968, the date on which the merger was consummated. This disparity in seniority dates caused New Haven employees to be placed on the PC–6 seniority roster behind the seventy-eight new employees hired between February 1 and October 31. Specifically, because of this ranking of seniority, in 1981 and 1982, plaintiffs were blocked from obtaining positions that were within the former PC–6 district by some of the seventy-eight Penn Central employees hired in the interim period.[8]

Plaintiffs contend, pursuant to 49 U.S.C. § 11347, that the disparity in the seniority dates violates the ICC orders pertaining to the initial merger and the later inclusion of the New Haven. Specifically, plaintiffs argue that because the ICC expressly adopted and approved the MPA and the December 20, 1966, and the January 9, 1967 agreements applying the provisions of the MPA to New Haven employees "the same as though they were employees of the Pennsylvania or Central," the defendants violated the provisions upon which the merger was approved. In addition, plaintiffs contend that pursuant to the negotiations between the defendants, Conrail violated the collective bargaining agreements pertaining to the merger and the BLE and UTU breached their duty of fair representation by agreeing to these separate seniority dates.

In general, defendants seek summary judgment, Fed.R.Civ.P. 56(b), on four distinct grounds. First, defendants contend that this Court lacks subject matter jurisdiction over plaintiffs' claims because, alternatively, (1) the ICC has primary jurisdiction over claims relating to the interpretation of its orders; (2) the Special Court of the Reorganization Act has jurisdiction over transactions arising out of the Reorganization Act; (3) the National Labor Adjustment Board has jurisdiction over all minor contractual disputes relating to the interpretation of collective bargaining agreements; and (4) plaintiffs have failed to exhaust available intra-union administrative remedies for their individual claims. Second, defendants argue that, regardless of the jurisdictional questions, plaintiffs' claims are time-barred by the applicable six-month statute of limitation of § 10(b) of the National Labor Relations Act. Third, defendants contend that plaintiffs have failed to state a claim under section 2 of the RLA, the 1970 Amtrak statute or the Interstate Commerce Act because either the provisions are inapplicable to the present case or the proper statutory showing has not been made. Finally, defendants contend that plaintiffs' breach of the duty of fair representation claims must fall on the merits because plaintiffs have not made a showing of "hostile discrimination."

## III

### A. *The ICC Order*

■ Section 11347 of the Interstate Commerce Act provides that an ICC order covering a merger arrangement "must require that the employees of the affected rail car-

---

**8.** Plaintiff Rainey's complaint stems from the fact that W. Pipe, a fireman on the Penn Central since July 7, 1968, was awarded a position in a train yard in Selkirk, New York, over Rainey due to their respective seniority standing on the PC–6 roster. Memorandum in Support of Defendant International Brotherhood of Locomotive Engineers' Motion for Summary Judgment at 19. In addition, Rainey initially was outbid for a yard switcher job by R.P. Raymond, a former New Haven hostler. While Raymond was below Rainey on the PC–6 roster, he had prior rights in the district where the yard job was available. *Id.* Nonetheless, Rainey eventually was awarded the position and has since left it with Raymond succeeding him. *Id.*

Plaintiff Allen's complaint stems from the fact that J.A. Sesock, above Allen on the PC–6 seniority roster, displaced Allen in November 1973. *Id.* at 21. In addition, P.L. Spaulding, a fireman on the Penn Central since June 28, 1968, was awarded a position on train WNWS–5 over Allen. *Id.*

Plaintiff Englehardt's complaint stems from the fact that he was displaced on a Selkirk, New York, assignment by P. Santandera on September 27, 1981. *Id.* at 23. Again, Santandera was ranked above Englehardt on the PC–6 roster due to the disparity in seniority dates. *Id.*

rier will not be in a worse position related to their employment as a result of the transaction during the four years following the effective date of the final action of the Commission." 49 U.S.C. § 11347. The Supreme Court has interpreted this language to provide an employee of a merging railroad with a private right of action for damages against his employer for violations of the ICC order pertaining to the merger. *Norfolk & Western Railroad v. Nemitz,* 404 U.S. 37, 41–44, 92 S.Ct. 185, 188–189, 30 L.Ed.2d 198 (1971). Merger protective agreements relating to employee rights and benefits expressly approved by the ICC are considered to be "conditions" of approval, *id.* at 43, 92 S.Ct. at 189, and therefore are covered by the ICC order and the private right of action. *Id.* at 43–44, 92 S.Ct. at 188–189.

▮ Plaintiffs contend that the ICC's order expressly approving and adopting the MPA language pertaining to the "fringe benefits or rights and privileges" of the employees, Conrail Exhibit No. 4, at 3, and the language of the December 20, 1966, and January 9, 1967 agreements mandating equal treatment for New Haven employees, has been violated by the disparity in the seniority dates. This Court concludes, however, that while a private cause of action may exist for the enforcement of the ICC order, the doctrine of primary jurisdiction requires that the ICC initially retain jurisdiction over the cause of action in order to determine whether such a disparity in seniority ranking actually violates the order.

▮ The doctrine of primary jurisdiction provides that when the courts and an administrative agency hold concurrent jurisdiction over a matter, "there may be sound reasons for the court to stay its hand until the agency has applied its expertise to the salient questions." *Hansen v. Norfolk & Western Railway,* 689 F.2d 707, 710 (7th Cir.1982). No fixed formula exists for the application of the doctrine. *Id.* Rather, a case-by-case factual analysis must be implemented in order to determine the existence of technical issues not within the

realm of judicial decision-making. *See, e.g., Great Northern Railroad v. Merchants Elevator Co.,* 259 U.S. 285, 294–95, 42 S.Ct. 477, 480, 66 L.Ed. 943 (1922); *Zapp v. United Transportation Union,* 727 F.2d 617, 625 (7th Cir.1984); *Augspurger v. Brotherhood of Locomotive Engineers,* 510 F.2d 853, 857 (8th Cir.1975). The Supreme Court, in *Far East Conference v. United States,* 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952), explained the applicable principles:

> [I]n cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.

*Id.* at 574, 72 S.Ct. at 494.

Under the present facts, an evaluation of the benefits and rights expressly guaranteed in the ICC order would require an analysis that is beyond "the conventional experience of judges" necessitating, as it would, an examination of the implementation of ICC discretionary authority in the Penn Central merger. In *Zapp v. United Transportation Union,* 727 F.2d 617 (7th Cir.1984), the Seventh Circuit was presented with a similar factual situation. In relation to the same merger, plaintiffs, 126 engineers and trainmen formerly employed by the Indianapolis Union Railway Company ("IU"), a former subsidiary of the Penn Central, brought an action against Conrail and UTU claiming that defendants had vio-

lated a 1974 ICC order requiring application of the MPA to Penn Central subsidiary employees. Plaintiffs had been given an April 1, 1976, seniority date on the New Conrail consolidated seniority roster, rather than a February 1, 1968, seniority date, the date of the Penn Central merger and the seniority date given to former Pennsylvania Railroad employees. Plaintiffs claimed that since the 1974 order stated that IU employees, as employees of a subsidiary, should be considered Pennsylvania employees, the ICC meant to require equal treatment of IU employees in collective bargaining over seniority rights. Applying the doctrine of primary jurisdiction to the issue of whether the order was violated, the Court rejected plaintiffs' contention and stated:

> We have no idea whether the 1974 order can properly be construed in this fashion. We therefore cannot act to enforce the 1974 order so construed until we know unambiguously what rights the order accords plaintiffs and whether the order has indeed been violated. That is the sort of determination (involving an extremely complex ICC-supervised merger) classically committed to agency discretion under the doctrine of primary jurisdiction.

*Id.* at 625.

Numerous unanswered issues of interpretation abound surrounding the extent of the 1966 and 1967 orders and their conditions. For example, no language in the ICC order or the MPA explicitly discusses the question of seniority rights. Rather, the MPA, later adopted in the ICC order, states that the employee is not to be placed "in a worse position with respect to compensation, rules, working conditions, fringe benefits or rights and privileges." Conrail Exhibit No. 4, at 3. It should not be assumed merely from this reference to rights and privileges that the MPA required equal treatment of New Haven employees in seniority ranking. Both the 1966 and 1967 ICC orders expressly state that "except to find, as we do, that the agreement of May 20, 1964 does not render the proposed transaction inconsistent with the public in-

terest, we can make no requirement as to the protection of employees covered by the agreement." 327 I.C.C. at 544; *see* 331 I.C.C. at 729. Moreover, labor protective conditions in such pre-merger agreements generally establish rights for the employee in relation to the employing railroad, rather than in relation to other employees. *Zapp v. United Transportation Union,* 727 F.2d at 623 n. 10, 624. An employee's position on a consolidated seniority list is "primarily a problem of priority *among employees* once the union and employer have determined the total number of jobs available." *Id.* (emphasis added). The inclusion of seniority rights within the provisions of the MPA, therefore, is far from clear.

Finally, it is at least arguable that the language in the December 20, 1966 and January 9, 1967 agreements, mandating that the treatment of New Haven employees be "the same as though they were employees of the Pennsylvania or Central," applies only to the prohibition in the MPA against putting an employee in a *worse position* than he had been previously in relation to privileges, rights and benefits. Under this reading, as long as New Haven employees retained seniority rights and opportunities that they had prior to the merger, the provisions of the MPA and ICC order would be fulfilled. Rather than partake in a game of judicial guesswork, the Court believes that the more appropriate course of action is to permit the ICC to determine, from an analysis of its own language, whether a violation actually has occurred.

Additional support for this position is found in the Eighth Circuit's decision in *Augspurger v. Brotherhood of Locomotive Engineers,* 510 F.2d 853 (8th Cir.1975). In *Augspurger,* plaintiffs brought suit seeking damages and a declaratory judgment for the union's alleged breach of the duty of fair representation in the negotiation of a consolidated seniority roster pursuant to a merger of several railroads. *Id.* at 855–56. Relying on a series of cases involving mergers pursuant to orders issued by the Civil Aeronautics Board ("CAB"), *see, e.g.,*

*Kesinger v. Universal Airlines, Inc.,* 474 F.2d 1127 (6th Cir.1973); *Oling v. Air Line Pilots Association,* 346 F.2d 270 (7th Cir.), *cert. denied,* 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965), the Eighth Circuit held that, absent a showing of unfair representation, when the only issue is the manner in which seniority rosters have been consolidated pursuant to an ICC order, the court should defer to the primary jurisdiction of the ICC. *Augspurger v. Brotherhood of Locomotive Engineers,* 510 F.2d at 857. The policy of judicial deference to administrative review of complex mergers was clearly stated:

> This important area of the total complex of merger considerations cannot be subject to independent scrutiny and interference by the courts pursuant to a separate statutory scheme. The parties affected by the CAB merger order cannot be required to answer in different forums at different times on different charges for actions taken under the CAB merger umbrella.

*Id.* (quoting *Hyland v. United Air Lines, Inc.,* 254 F.Supp. 367, 372 (N.D.Ill.1966)). *Accord Anderson v. United Transportation Union,* 557 F.2d 165, 169 (8th Cir. 1977).

Plaintiffs contend that the primary jurisdiction doctrine should not be applied for two basic reasons. First, plaintiffs contend that the ICC order and incorporated agreements are clear on their face in applying the same seniority rights to New Haven employees as applied to Pennsylvania and New York Central employees. Noting that "[w]hen the words of a written instrument are used in their ordinary meaning, their construction presents a question solely of law," *Great Northern Railroad v. Merchants Elevator Co.,* 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922), plaintiffs urge that there are here presented no technical questions of fact requiring administrative review.

Second, plaintiffs argue that seniority rights clearly were contemplated in the MPA and ICC order. In making this claim, plaintiffs point to the MPA language pro-

hibiting employees from being placed in worse positions regarding benefits and rights, and to the express purpose of the October 11, 1966 agreement establishing PC–6 seniority district. The express purpose of the agreement, according to plaintiffs, was to explain "how the provision of the Merger Protection Agreement will apply to the engine service employees of the Merged Company." Conrail Exhibit No. 3 at 3.

Plaintiffs' reliance on these arguments, however, is not persuasive. As indicated above, this Court does not find the terms of the orders at all clear in relation to employee benefits. If the wording of the labor protective agreement is in fact given its "ordinary meaning," it is arguable that seniority rights were not contemplated, since such rights generally are not the subject of such agreements. *Zapp v. United Transportation Union,* 727 F.2d at 623 n. 10, 624. Moreover, the policy of initial non-interference in administrative merger matters discussed in *Augspurger* and its predecessors is nonetheless applicable. Consequently, the ICC should initially determine the extent of its orders pertaining to the merger.

In addition, the MPA language, coupled with the express purpose of the October 11, 1966 agreement, does not necessarily manifest the contemplation of seniority rights. The October agreement has three express purposes: to define the MPA's applicability to engine service employees, Conrail's Exhibit No. 3, at 1; to expedite changes in "services, facilities and operations of the Merged Company through negotiation of implementing agreements," *id.;* and "[t]o provide for the procedure by which existing agreements between the parties shall be modified to conform with the changes in services, facilities and operations," *id.* at 4. Because three separate purposes are listed in the agreement, it is unclear whether the establishment of seniority districts within the agreement was in fact effected pursuant to the first purpose, i.e., to define the applicability of the MPA to the employees. Indeed, the rearrangement of seniority dis-

tricts is listed under the second purpose, i.e., to expedite change in operations. *Id.* at 1. For plaintiffs to suggest, therefore, that the October agreement clearly establishes the contemplation of seniority rights is unfounded.

Plaintiffs further attempt to distinguish the policy argument in *Augspurger* in two ways. First, it is contended that CAB mergers, upon which the *Augspurger* analysis is based, are unique because the CAB specifically reserves continuing jurisdiction over seniority matters. *See, e.g., Kesinger v. Universal Airlines, Inc.,* 474 F.2d 1127, 1130 (6th Cir.1973); *Oling v. Airline Pilots Association,* 346 F.2d 270, 273 (7th Cir.), *cert. denied,* 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965). Second, plaintiffs argue that *Augspurger* dealt with a situation in which there was a conflict over the *method* of consolidating seniority rosters, rather than the present situation in which there is a conflict over the application of the agreements to plaintiffs.

Plaintiffs' attempt to distinguish CAB mergers from ICC mergers, however, is expressly belied by the holding in *Augspurger.* In examining the policy of initial non-interference in merger conflicts, the *Augspurger* court specifically applied these policies to the ICC. *Augspurger v. Brotherhood of Locomotive Engineers,* 510 F.2d at 857. In particular, the Court noted that: "[t]he process whereby the CAB *and the ICC* supervise the merger of carriers is a difficult and lengthy one which would be

greatly impeded were disgruntled employees, consumers, and other affected parties permitted to bring lawsuits in other forums." *Id.* (emphasis added). While it is true that *Augspurger* relied on cases in which the CAB expressly retained jurisdiction over seniority matters, the same policy of judicial non-interference in the supervision of mergers applies to ICC mergers where such jurisdiction is not expressly retained. The existence of language reserving administrative jurisdiction over such matters does not foreclose the application of such jurisdiction in situations where it is not expressly reserved, but problems regarding the interpretation of an ICC order arise. The interest in initial non-interference remains the same.

Finally, plaintiffs' attempt to distinguish a conflict over the method of seniority consolidation from a conflict over how the seniority consolidation system is applied also is unpersuasive. Questions of application require no less technical knowledge and insight into what the ICC meant to guarantee in its 1966 and 1967 orders. There is no way in which this Court can confront the issue of seniority rights without the ICC initially clarifying the coverage of its orders and determining whether a violation actually has occurred.

 In light of the need for ICC review of its own orders, this Court is constrained to dismiss plaintiffs' cause of action for violation of the ICC orders for lack of jurisdiction.[9] Plaintiffs, however, are

---

9. Defendants set forth three additional jurisdictional challenges to plaintiffs' claims. First, defendants argue that plaintiffs' claims require interpretations of collective bargaining agreements, and thus, should be dismissed as "minor disputes" subject to the jurisdiction of the National Railroad Adjustment Board. *See* 45 U.S.C. § 153, subd. 1(i). A "minor dispute" involves "the application of particular provisions of an agreement that are not the subject of a proposal for change. They relate to rights already accrued rather than to proposals for future rights." *Air Cargo, Inc. v. Local Union 851, International Brotherhood of Teamsters,* 733 F.2d 241, 245 (2d Cir.1984). By contrast, a "major dispute" involves the "formation of collective bargaining agreements or changes in the terms of existing agreements. They relate to 'the acquisition of rights for the future, not to

assertion of rights claimed to have vested in the past.' " *Id.* (quoting *Elgin, Joliet & Eastern Railway v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945)). In view of this Circuit's definitions of "major" and "minor" disputes, this Court is of the opinion that the present controversy is a "major dispute" and thus within the jurisdiction of the Court. The issue involved in the present case is not whether the December 20, 1966, and January 9, 1967 agreements are being interpreted properly. Rather, plaintiffs are contending that the formation of these agreements was invalid in light of the ICC orders. *See Zapp v. United Transp. Union,* 727 F.2d 617, 626 n. 13 (7th Cir.1984).

Second, defendants contend that pursuant to the Reorganization Act, a three-judge Special Court, Regional Rail Reorganization Act of 1973

entitled to petition the ICC for a declaration of rights under the orders. Once these rights are clarified, plaintiffs may then file suit to enforce such rights. 28 U.S.C. § 1336(a).[10]

## B. *Duty of Fair Representation and Violation of Collective Bargaining Agreements*

It is well established that an employee may bring an action against his employer for a breach of a collective bargaining agreement, *Smith v. Evening News Association,* 371 U.S. 195, 200–01, 83 S.Ct. 267, 270–271, 9 L.Ed.2d 246 (1962), and against his union for breach of the union's duty of fair representation. *Steele v. Louisville & Nashville Railroad,* 323 U.S. 192, 207, 65 S.Ct. 226, 234, 89 L.Ed. 173 (1944). Such a cause of action has been judicially implied under both the National Labor Relations Act ("NLRA") and the RLA.[11] *E.g., DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 2290–95, 76 L.Ed.2d 476 (1983); *Steele v. Louisville & Nashville Railroad,* 323 U.S. 192, 199, 207, 65 S.Ct. 226, 230, 234, 89 L.Ed. 173 (1944). Nevertheless, defendants contend that application of the six-month statute of limitations under § 10(b) of the NLRA bars plaintiffs' claims. Because of the implied nature of the cause of action, however, no express statute of limitations exists in the RLA for bringing the action. *See DelCostello v. International Brotherhood of Teamsters,* 103 S.Ct. at 2287. In such cases, "we do not ordinarily assume that Congress intended that there be no time

---

(Special Court) has exclusive jurisdiction over the action since it relates to the enforcement, operation and interpretation of the Northeast Rail Services Act of 1981 (NRSA). 45 U.S.C. § 1105(a). In light of his Court's holding that jurisdiction is lacking under the doctrine of primary jurisdiction, any discussion of this issue as it relates to the cause of action for the violation of the ICC order is unnecessary. As for plaintiffs' claims relating to the breach of the collective bargaining agreement and the duty of fair representation, this Court believes that jurisdiction is maintained. The competence of the Court to hear such claims is well established. *See DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 2290, 76 L.Ed.2d 476 (1983); *Steele v. Louisville & Nashville R. Co.,* 323 U.S. 192, 207, 65 S.Ct. 226, 234, 89 L.Ed. 173 (1944). Neither the Reorganization Act nor the NRSA purport to encompass such claims.

Third, defendant UTU asserts that plaintiffs have not exhausted internal union remedies. In relation to the fair representation claims, however, plaintiffs need not exhaust such remedies when the attempt would be futile. *See Clayton v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America,* 451 U.S. 679, 685, 101 S.Ct. 2088, 2093, 68 L.Ed.2d 538 (1981). In the present case, because plaintiffs realized, and in fact were told, that the unions viewed their claims as having no merit, such an attempt to use these remedies would have been futile. In addition, even if plaintiffs had proceeded to use these internal procedures, the union alone would not have settled this dispute since the union alone could not alter the collective bargaining agreements. This entire discussion, however, is academic considering the alternative grounds for dismissal in the present case.

**10.** While a stay in the proceedings, rather than a dismissal, is permitted and often used in cases of primary jurisdiction, *Hansen v. Norfolk and Western Ry. Co.,* 689 F.2d 707, 714 (7th Cir. 1982), it is not necessary when "all of the relief that is sought in court can be obtained in an administrative forum or in an easily initiated suit subsequent to the administrative proceedings." *Id.* Because the ICC can rule on the issue of whether a violation exists and plaintiffs may simply initiate a new suit to enforce the ICC determination, proper relief can be obtained at that time. *See Zapp v. United Transp. Union,* 727 F.2d 617, 625 (7th Cir.1984).

**11.** In addition to section 2 of the RLA, 45 U.S.C. § 152, plaintiffs claim a cause of action arising from the Rail Passenger Service Act. 45 U.S.C. § 565. Other than listing it as a basis for jurisdiction, however, plaintiffs do not argue this cause of action expressly in their opposition papers to the summary judgment motions. The Court is at a loss to ascertain the relevance of this provision to the action. The section deals with situations in which there is a discontinuance of intercity rail passenger service. 45 U.S.C. § 565. Plaintiffs' papers do not plead any such loss of service from the merger. Even if such a loss did in fact occur from the merger, the loss of rail service had nothing to do with the basis for the present complaint which relates solely to disparity in seniority dates. Moreover, the provision, which was passed in 1970, did not exist at the time of the execution of the agreements. Consequently, the Court must conclude that 45 U.S.C. § 565 has no relevance to plaintiffs claims.

limit on actions at all; rather, our task is to 'borrow' the most suitable statute or other rule of timeliness from some other source." *Id.* at 2287.

The Supreme Court, in *DelCostello*, faced with an alleged breach of the duty of fair representation against the unions pursuant to the Labor Management Relations Act ("LMRA"), held that the six-month statute of limitations of section 10(b) of the NLRA, 29 U.S.C. § 160(b),[12] should be applied in such actions. *Id.* at 2290. The Court stated:

> [W]hen a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigants make that rule a significantly more appropriate vehicle for interstitial lawmaking, we have not hesitated to turn away from state law.

*Id.* at 2294.

The application of the six-month statute of limitations was predicated on two policy arguments. First, the Court stressed the need for uniformity in fair representation cases. *Id.* at 2289. It thus eschewed application of various state statutes of limitation. *Id.* at 2294.[13] Second, stressing the need for speedy resolution of such labor disputes, *id.* at 2292, the Court noted that: "[W]hile application of a short arbitration period as against employers would endanger employees' ability to recover most of what is due them, application of a longer malpractice statute as against unions would preclude the relatively rapid final resolution of labor disputes favored by federal law." *Id.*

■ Since *DelCostello*, three circuits, including the Second Circuit, have opted to apply the six-month statute of limitations of § 10(b) of the NLRA to fair representation claims arising under the RLA. *Welyczko v. U.S. Air, Inc.*, 733 F.2d 239 (2d Cir.1984); *Sisco v. Consolidated Rail Corp.*, 732 F.2d 1188 (3d Cir.1984); *Hunt v. Missouri Pacific Railroad*, 729 F.2d 578 (8th Cir.1984). In *Welyczko*, the Second Circuit determined that the policies of uniformity and speedy resolution of labor disputes discussed in *DelCostello* "apply with equal force to substantively identical claims under the Railway Labor Act." *Welyczko v. U.S. Air, Inc.*, 733 F.2d at 240. The Court, therefore, applied the period to an RLA claim arising from an employee's termination. *Id.* In *Sisco*, the Third Circuit applied the six-month period to an action arising from a dispute over seniority rights.[14] *Sisco v. Consolidated Rail Corp.*, 732 F.2d at 1193. In light of the Second Circuit's guidance and the lack of any contrary post-*DelCostello* case law, this Court believes that the policies of uniformity and speedy resolution of labor disputes require application of the six-month statute of limitations to the present case. The only remaining question involves a determination of when plaintiffs' cause of action accrued.

■ The general rule in this circuit is that a cause of action accrues when "the plaintiff could first have successfully maintained a suit based on that cause of action." *Santos v. District Council of New York City*, 619 F.2d 963, 968–69 (2d Cir.

**12.** Section 10(b) of the NLRA, 29 U.S.C. § 160(b) provides a six-month statute of limitations for the filing of unfair labor practice charges.

**13.** Prior to *DelCostello*, courts had continually borrowed state statutes of limitations for the cause of action. *See United Parcel Service, Inc. v. Mitchell,* 451 U.S. 56, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981); *International Union UAW v. Hoosier Cardinal Corp.,* 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966).

**14.** In *Sisco,* plaintiff was employed by the Renova Division of the Pennsylvania Railroad in 1956 and 1957. It was alleged that during this time, plaintiff acquired seniority rights under a collective bargaining agreement with his union. In 1963, plaintiff commenced working in the Buffalo division from which he was laid off in January of 1971. In March of 1971, the railroad requested that plaintiff return to employment in Buffalo. Plaintiff then declined the request and claimed seniority rights to the Renova Division. The railroad, however, interpreted this refusal as a forfeiture of seniority rights. Plaintiff commenced suit after the union failed to challenge the railroad's ruling before the National Rail Adjustment Board.

1980) (quoting *Bell v. Aerodex, Inc.*, 473 F.2d 869, 873 (5th Cir.1973)). In situations where a breach of the duty of fair representation is alleged, the cause of action accrues "no later than the time when plaintiffs knew or reasonably should have known that such a breach had occurred, even if some possibility of non-judicial enforcement remained." *Santos v. District Council of New York City*, 619 F.2d at 969.

Under the present facts, the cause of action against the union and Conrail flows directly from the agreements entered into in 1968 and 1969, establishing February 1, 1968, and November 1, 1968, as the seniority dates for the PC–6 roster. The PC–6 roster initially was made available for inspection in 1969. Plaintiffs became aware of its existence and their respective positions on the roster in 1970. Deposition of Edward Engelhardt, at 501; Deposition of Edward Rainey, at 49; Deposition of David Allen, at 272–74. Plaintiffs were *affected* by the PC–6 roster by 1982, when each was at least initially denied a position on the former New York Central tracks due to the positions of the seventy-eight employees hired in the interim period between the seniority dates.

██ Applying the *Santos* rule here, and construing the facts most favorably to plaintiffs, i.e., deeming the cause of action to have accrued when plaintiffs were *affected* by the PC–6 roster and therefore became unquestionably aware of the breach, plaintiffs' cause of action is nonetheless time-barred. The complaint was filed on August 10, 1983. Plaintiffs admit that by 1982 they knew that the unions would not pursue their claims. Deposition of Edward Engelhardt, at 156, 165; Deposition of Edward Rainey, at 156, 165; Deposition of David Allen, at 392. At best, therefore, the statute of limitations commenced running in 1982. It nonetheless took plaintiffs well over six months to commence this action. Under a more realistic view, the accrual of the cause of action actually occurred years ago when plaintiffs discovered that they had been placed in a low position on the PC–6 roster. At that point, plaintiffs' rights possibly were infringed even though the plaintiffs were not individually affected by their standing until several years later. Regardless of the date chosen as the appropriate accrual date, it is obvious that permitting plaintiffs to commence an action more than six months after their claims accrued would violate the policies set forth in *DelCostello*. This Court therefore holds that plaintiffs' claims of a breach of the collective bargaining agreement and the duty of fair representation are time-barred by the running of the six-month statute of limitations.

In opposition to the instant motions, plaintiffs do not directly contest the accrual date of their action. Rather, plaintiffs contend that the breach of the duty of fair representation and the violation of the ICC order should be considered "continuing violations." Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment and in Support of Partial Summary Judgment for Plaintiffs on the Issue of Liability, at 23–25 ("Plaintiffs' Memo"). According to plaintiffs, when the claims are based on a "continuing violation," "the applicable statute of limitations determines only the period of time for which damages may be recovered and has no effect on the availability of injunctive relief." *Id.* at 23; *see Brotherhood of Locomotive Firemen and Enginemen v. Mitchell*, 190 F.2d 308, 312–13 (5th Cir. 1951).

Plaintiffs rely on the Supreme Court's decision in *Local Lodge No. 1424, International Association of Machinists v. NLRB*, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960). In *Local Machinists*, a contention that the continued enforcement of a collective bargaining agreement constituted a continuing unfair labor practice because, at the time of the agreement's execution, the union did not represent a majority of employees as required by the NLRA, was rejected. *Id.* at 423, 80 S.Ct. at 830. In holding the violation not to be continuing, the Court distinguished the situation where the "bargaining agreement and its

enforcement are both perfectly lawful on the face of things, and an unfair labor practice cannot be made out except by reliance on the fact of the agreement's original unlawful execution." *Id.* at 419, 80 S.Ct. at 828. The Court held that in such a situation, no continuing violation could exist. Plaintiffs, therefore, contend that if "the terms of a collective bargaining agreement do not comply with statutory directives, the continuing violation theory will be applied and the statute of limitations will not bar relief." Plaintiffs' Memo at 24.

Application of the "continuing violation" doctrine since *Local Machinists*, however, establishes that an alleged breach of a union's duty of fair representation cannot be considered a continuing violation of the negotiated agreements. *E.g., Metz v. Tootsie Roll Industries, Inc.,* 715 F.2d 299 (7th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 976, 79 L.Ed.2d 214 (1984); *Former Frigidaire Employees Association v. International Union of Electrical, Radio and Machine Workers,* 573 F.Supp. 59 (S.D.Ohio 1983); *Adkins v. General Motors Corp.,* 573 F.Supp. 1188 (S.D.Ohio 1983). In *Metz,* a former employee brought an action against his employer for breach of the collective bargaining agreement and against the union for breach of the duty of fair representation. *Metz v. Tootsie Roll Industries, Inc.,* 715 F.2d at 301. The action arose pursuant to the failure of the union to represent the plaintiff adequately in a grievance relating to plaintiff's discharge from employment. *Id.* at 300–01. In an attempt to avoid statute of limitations problems, plaintiff contended that the union's failure to personally inform her of its decision regarding the processing of her grievance constituted a continuing violation. In rejecting plaintiff's position, the court distinguished the *Local Machinists* analysis from the present breach:

> Since nothing other than union inactivity is alleged to have occurred since May 5, 1981, which is more than six months prior to the time this action was brought, the principles set out in *Bryan Manufac-*

*turing [Local Lodge No. 1424 v. N.L. R.B.,* 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960)] bar the bringing of this action. That is, even if it is conceded that the Union's inactivity constituted a continuing unfair labor practice, it is only an unfair labor practice by reason of circumstances existing at or before May 5, 1981. The Union's inactivity in the instant case, like the enforcement of the bargaining agreement in *Bryan Manufacturing,* is, absent its earlier dereliction, lawful conduct. If this court were to permit the cloaking of this inactivity with illegality by invoking events which occurred more than six months prior to the bringing of this action, it would in effect be reviving a legally non-cognizable unfair labor practice.

*Id.* at 306.

Echoing this analysis, the district court in *Adkins v. General Motors Corp.,* 573 F.Supp. 1188 (S.D.Ohio 1983), discussing a similar claim, stated:

> Plaintiffs were damaged, at the latest, in January of 1981 when they realized (or should have realized) that their job recall rights had been impaired. No further acts by the unions or company defendants are necessary to further complete or amplify such damages. Once the original damage is lodged, the mere fact that the Defendants are "continuing" to implement allegedly improper collective bargaining agreements does not convert Plaintiffs' loss of jobs into a "continuing violation."

*Id.* at 1193. *Accord Former Frigidaire Employees Association v. International Union of Electrical, Radio and Machine Workers,* 573 F.Supp. 59, 62 (S.D.Ohio 1983).

■ The *Metz* and *Adkins* application of *Local Machinists* is persuasive in the present case. Even if BLE's and UTU's conduct of agreeing to separate seniority effective dates for New Haven employees and Pennsylvania and New York Central employees did in fact breach the duty of fair representation to plaintiffs, it is only

an unfair labor practice in light of the previously negotiated agreements, i.e., the MPA. Absent such earlier understandings, the negotiated agreements containing the seniority dates are legal. Nothing except union inactivity since the time of the agreement is alleged by plaintiffs. The mere fact that the unions have continued to apply the agreements since their inception does not render them a continuing violation. The agreements were entirely negotiated over fifteen years ago. In this interim period, nothing further has been added to them. Thus, the damage to plaintiff, if any, was done with one fell swoop: the signing of the agreements in the late sixties. The Court therefore finds inescapable the conclusion that the alleged breach of the duty of fair representation by defendants cannot be considered a continuing violation, and thus, is time-barred.[15]

Finally, plaintiffs contend that the six-month statute of limitations under § 10(b) of the NLRA is not the appropriate period to apply in this instance. Rather, plaintiffs suggest that the appropriate time period is two years as is allowed for the filing of a complaint with the ICC to recover damages under § 11705(b)(2) of the Interstate Commerce Act. 49 U.S.C. § 11706(c)(1). Plaintiffs rely on the Sixth Circuit's decision in *Modin v. New York Central Co.,* 650 F.2d 829 (6th Cir.), *cert. denied,* 454 U.S. 967, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981). In *Modin,* an employee's widow brought an action against the Penn Central for the cancellation without notice of a life insurance policy covering the employee. *Id.* at 831–32. Plaintiff contended that, by cancelling the policy, Penn Central had violated 49 U.S.C. § 5(2)(f) governing the treatment of employees during railroad consolidations and also had violated the ICC order governing the consolidation. *Id.* The Court rejected the claims and determined that the second cause of action, alleging violations of the ICC order, was time-

barred since plaintiff had not commenced her action within the applicable two-year statute of limitations. *Id.* at 833–34.

The Sixth Circuit's application of the two-year statute of limitations, however, is distinguishable from the present case. In *Modin,* no claims for breach of a collective bargaining agreement or the duty of fair representation existed. *Modin* applies the two-year statute of limitation only to the cause of action for violations of the ICC order, *id.,* a cause of action over which this Court has ruled that no jurisdiction exists. *Modin* in no way can be read to apply such an extended time period to other actions under the RLA. To do so would be to ignore the language in *DelCostello* calling for speedy resolution of labor disputes. *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. at ——, 103 S.Ct. at 2292.

## IV

Given the timing of plaintiffs' claims and the administrative issues involved, defendants' motions for summary judgment hereby are granted. The Court holds that no jurisdiction exists for the cause of action arising from the alleged violation of the ICC order and thus it is dismissed in light of the ICC's primary jurisdiction. Plaintiffs' other claims for breach of collective bargaining agreements and for breach of the duty of fair representation are dismissed as time-barred pursuant to the applicable six-month statute of limitations.

It is so Ordered.

---

**15.** In reaching this conclusion, the Court does not address plaintiffs' second contention: that the violation of the ICC order is a continuing violation. Plaintiffs' Memo, at 25–27. Since the Court has determined that the doctrine of primary jurisdiction requires dismissal of the cause of action for the violation of the ICC order, any discussion of the statute of limitations for such a cause of action is unnecessary.